Ferdie P. WILTZ, et al.

v.

**M/G TRANSPORT SERVICES, INC., et al.**

**Civil Action No. 95–7.**

United States District Court, E.D. Kentucky, Covington Division.

April 25, 1996.

James B. Helmer, Helmer, Lugbill, Martins & Neff, Cincinnati, OH, Meredith L. Lawrence, Crestview Hills, KY, for Plaintiffs.

Stephen S. Eberly, Vorys, Sater, Seymour & Pease, Cincinnati, OH, David A. Skidmore, Jr., Frost & Jacobs, Cincinnati, OH, for M/G Transport Services, Inc.

Robert F. Keith, Michael R. Schmidt, Cohen, Todd, Kite & Stanford, Cincinnati, OH, Stephen S. Eberly, Vorys, Sater, Seymour & Pease, Cincinnati, OH, David A. Skidmore, Jr., Frost & Jacobs, Cincinnati, OH, for Midland Company.

Jack F. Fuchs, Thompson Hine & Flory, P.L.L., Cincinnati, OH, H. Lawson Walker,

II, William C. Gullett, Brown, Todd & Heyburn, Covington, KY, S. Mark Klyza, Barclay D. Beery, Kullman, Inman, Bee, Downing & Banta, New Orleans, LA, for Ingram Ohio Barge Co.

## MEMORANDUM OPINION & ORDER

BERTELSMAN, Chief Judge.

This is an attempted class action brought on behalf of approximately 160 people who lost their jobs when defendant M/G Transport Services, Inc. ("M/G") sold its river operation assets ("towboats") to defendant Ingram Ohio Barge Company ("Ingram"). Plaintiffs allege that neither Ingram, M/G, nor M/G's parent corporation, The Midland Company ("Midland"), notified the employees of the loss of their jobs within 60 days as required by the Workers Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2101–2109.

This case is currently before the court on various cross motions for summary judgment (Docs. # 81, # 85, # 89, and # 87).[1]

## FACTUAL BACKGROUND

On December 28, 1994, M/G sold 314 barges and 8 towboats to Ingram.[2] This sale affected the former employees of M/G whose jobs were terminated on the afternoon of the sale. The employees affected constituted virtually the entire work force of M/G Transport. Neither M/G nor Ingram provided the employees with 60 days advance notice of termination.

M/G's towboats transported barges throughout the Ohio, Mississippi, and Tennessee River systems. These towboats traveled as much as 2000 miles from Pittsburgh to the mouth of the Mississippi River. Crew members were generally on a towboat for 30 consecutive days followed by the same period of time off the towboat. Because of the 30–days–on and 30–days–off schedule, each towboat had essentially two crews consisting of twenty employees.

Some workers spent lengthy periods of time assigned to a particular towboat. Plaintiff Wiltz, for example, spent most of his time on one of three towboats but also worked on other towboats temporarily. He spent 12 years on one towboat and 14 years on another.

All food, fuel, and supplies for the towboats were ordered and purchased by the Paducah office and were delivered to the towboats at various locations. Each towboat had complete living quarters including a galley, sleeping quarters, bathing facilities, and a crew lounge. However, crew members could not make major repairs to the towboats.

Each towboat had a supervisory hierarchy. The Captain was in overall charge of the crew. The Mate, Chief Engineer, and Cook all reported to the Captain. The Mate and Chief Engineer also supervised other personnel on the towboat. However, the parties dispute whether the towboat's supervisors or the Paducah home port had the power to hire and fire. Finance, personnel, and management were all centrally located in Paducah. Some of the employees maintained homes in the Paducah area. However, many of the employees lived in other towns and cities along the Ohio and Mississippi Rivers.

During negotiations for the sale, M/G asked Ingram to hire M/G's personnel. Ingram, however, wanted to avoid any requirement that it hire M/G employees. The parties also disagreed regarding their respective liability for WARN Act notification. M/G did not want to accept this liability because it did not want to bear the cost of providing 60 days of pay and it feared that providing notice might result in employees quitting before the sale.

Both companies attempted to resolve this situation by having neither assume the potential WARN Act liability in the final pur-

---

1. In a previous disposition of this case, this court tentatively held that defendants could be held jointly and severally liable for any WARN Act violation since the defendants came into this action with unclean hands in that they obviously arranged their sale of assets to attempt to defeat the rights of the plaintiffs, if any, under the statute. *Wiltz v. M/G Transport Services, Inc.,* Cov.Civ. No. 95–7 (E.D.Ky. Oct. 16, 1995).

2. Unless otherwise noted, the facts of this case are not in dispute. Thus, the parties have asked the court to decide this case as a matter of law.

chase agreement. Ingram, however, did retain the option to hire M/G's former employees. Ingram chose December 28 as the closing date of the sale in order to take advantage of tax rules.

On December 14, 1994, M/G sent a memorandum to its employees advising them of a possible sale of assets to Ingram. M/G advised its employees that the company would lay off or terminate most of them. The memo encouraged the employees to apply for jobs with Ingram. M/G also stated in the memo that it hoped that Ingram would hire a large percentage of M/G's employees.

On December 28, M/G sent its employees final notice that their jobs had been terminated due to the company's sale of its river operations to Ingram. Ingram eventually employed 49 of the 104 former M/G employees that applied for work with Ingram.

## ANALYSIS

Congress enacted the WARN Act to provide workers, their families and communities, sufficient time to adjust to the prospective loss of employment and to obtain alternative jobs or job training. 20 C.F.R. § 639.1(a) (1995). If a mass layoff or plant closing occurs, a core provision of the WARN Act commands the employer to provide written notice to each affected employee at least sixty days prior to the closing or layoff. 29 U.S.C.S. § 2102 (1990). An employer who violates the WARN Act is liable for back pay, lost benefits, civil penalties, and attorneys' fees. 29 U.S.C.S. § 2104 (1990).

Under the WARN Act, this court must initially determine whether a sufficient number of employees suffered an employment loss at a **"single site of employment."** The court begins its analysis, as it must, with the statutory language.

The key definitions section of the WARN Act reads, "the term 'plant closing' means the ... shutdown of **a single site of employment,** or one or more facilities or operating units within a **single site of employment** ... [which] results in an employment loss at the

**single site** ... during any 30–day period for 50 or more employees." 29 U.S.C.S. § 2101(a)(2) (1990) (emphasis added). Similarly, a "mass layoff" is defined as a work force reduction which is not the result of a plant closing and which results in an employment loss at a **single site of employment** during a 30–day period and which affects at least 33 percent of the employees and at least 50 employees. 29 U.S.C.S. § 2101(a)(3) (1990) (emphasis added).

"Affected employees" are "employees who may reasonably be expected to experience an employment loss." 29 U.S.C.S. § 2101(a)(5) (1990). An "employment loss" means: "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6–month period." 29 U.S.C.S. § 2101(a)(6) (1990).

Although the parties have filed volumes of paper, upon reflection the issue seems to be a rather simple one: are a number of almost self-sufficient towboats ranging up and down thousands of miles of rivers a "single site of employment" under the WARN Act.

The regulations promulgated by the Department of Labor ("DOL") provide a lengthy exegesis on the concept of a "single site of employment."[3] The regulations state:

(1) A single site of employment can refer to either a *single location* or a *group of contiguous locations.* Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, may be considered a single site of employment.

(2) There may be several single sites of employment *within a single building,* such as an office building, if separate employers conduct activities within such a building....

(3) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment *if they are in reasonable*

---

**3.** Congress gave DOL the power to "prescribe such regulations as may be necessary to carry out" the WARN Act. 29 U.S.C.S. § 2107(a)

(1990). The defendants have not challenged the department's authority to issue these regulations.

*geographic proximity,* used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses *in an area* but who regularly shifts or rotates the same employees from one building to another.

(4) Non-contiguous sites *in the same geographic area* which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.

(5) *Contiguous buildings* owned by the same employer which have separate management, produce different products, and have separate workforces are considered separate single sites of employment.

(6) For workers whose primary duties require travel from point to point, who are outstationed, *or whose primary duties involve work outside any of the employer's regular employment sites* (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.[4]

20 C.F.R. § 639.3(i) (1995) (emphasis added). In addition, DOL recognized that "[t]he term 'single site of employment' may also apply to truly unusual organizational situations where the above criteria do not reasonably apply." 20 C.F.R. § 639.3(i)(8) (1995). However, DOL cautioned that "[t]he application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable." *Id.*[5]

■ The plain meaning of the statute and the regulations is that the WARN Act is not applicable if there are separate layoffs or closings not resulting in job losses to 50 or more employees working in one geographic area. The legislative history of the WARN Act confirms this. Earlier drafts of the statute had used the term "place of employment." The Conference Agreement indicated that Congress deemed this terminology too comprehensive and, therefore Congress struck all references to "place of employment" and replaced it with "single site of employment." 134 Cong.Rec. S8686–01 (daily ed. June 28, 1988). Through this change, Congress "intended to clarify that *geographically separate operations are not to be combined* when determining whether the employment threshold for triggering the notice requirement is met." *Id.* (emphasis added).

In *McClain v. Laurel Street Art Club,* this court was called upon to determine whether two plants approximately 11 miles apart were "single sites of employment" under the WARN Act. *McClain v. Laurel Street Art Club,* 925 F.Supp. 496 (E.D.Ky.1995).[6] Adopting the test enunciated by the court in *United Food & Commercial Workers Union v. Giant Markets, Inc.,* this court held that the key factor was whether the two sites shared a common workforce. *Id.* (citing *United Food & Commercial Workers Union v. Giant Markets, Inc.,* 878 F.Supp. 700 (M.D.Pa.1995)). Such a test is appropriate for sites within the same geographic area.

A careful reading of the statute and regulations reveals, however, that such a test is inappropriate where the "sites" are not in the same general geographic area. Subsections one through five of the regulations speak of "a campus or industrial park," "a single building," "separate buildings" in "reasonable geographic proximity," "non-contiguous sites

---

**4.** DOL's comments indicate that the department was concerned about "traveling workers who report to but do not work out of a particular office." 54 Fed.Reg. 16042, 16051 (1989). "While such workers may well be considered as a separate operating unit, their status must be determined in terms of the single site of employment to which they are assigned." *Id.*

**5.** DOL was concerned that employers might use the "catchall clause" to evade the purpose of

WARN notice. *See* 54 Fed.Reg. 16,042, 16050 (1989). DOL was not concerned with using the single site of employment requirement to defeat a WARN Act claim.

**6.** *Laurel Street Art Club* is currently on appeal and has not hitherto been published. The court, however, is submitting it for publication along with this opinion for ready reference.

in the same geographic area," and, "contiguous buildings" with "separate management." 20 C.F.R. § 639.3(i) (1995). All of these subsections thus deal with situations where the sites are in the same geographic area.

■ This court therefore holds that the common workforce test employed in *Laurel Street Art Club* is not applicable unless the sites of employment are in the same geographic area. Where, as here, the sites are not in the same geographic area, they are separate sites of employment as a matter of law.

In the court's reading of the WARN Act, the plain meaning of the statutory language requires this conclusion. The regulations are only valid if limited to ambiguities arising from sites in the same geographic area which might evade the purpose of the WARN Act by artificially dividing up operations.

One of the purposes of the WARN Act was to provide local communities, as well as workers, some warning when a large group of workers suddenly becomes unemployed within a short period of time. *See e.g.,* 134 Cong.Rec. 15,514 (June 22, 1988) (statement of Sen. Byrd). Local communities are not as adversely affected by the sudden unemployment of a large number of workers if the sites of employment are geographically separated. The statutory language and the legislative history make this point clear.

The regulations only fine tune the application of the WARN Act in ambiguous situations within the same locality. *Cf. Rifkin v. McDonnell Douglas Corp.,* 78 F.3d 1277 (8th Cir.1996); *Williams v. Phillips Petroleum Co.,* 23 F.3d 930 (5th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 582, 130 L.Ed.2d 497 (1994); *UMW v. Jim Walter Resources, Inc.,* 6 F.3d 722 (11th Cir.1993); *Salyer v. Universal Concrete Products,* No. 90–3579, 1991 WL 135532 (6th Cir. July 24, 1991); *McClain v. Laurel Street Art Club,* 925 F.Supp. 496 (E.D.Ky.1995).

■ Under the uncontested facts of this case, each towboat was a site of employment operating semi-autonomously. Each crew worked on the towboat for a 30–day period. During that time, the captain received some directions from the Paducah office and many of his discretionary actions were subject to the approval of the Paducah office. However, the captain otherwise managed the towboat. Each towboat had complete sleeping, dining, bathing and sanitary facilities. The towboats ranged for thousands of miles up and down the inland waterways, each towboat independent of the other, although each remained in touch with the Paducah office. Seamen boarded and left the towboats at various locations and did not live in the same geographic area. Thus, there was no collective impact on any such area.

Plaintiffs argue that 20 C.F.R. § 639.4(i)(6), quoted *supra,* which concerns traveling employees, is applicable to this case. This court disagrees. The subsection cited by plaintiffs refers to employees who are "outplaced" or travel from their site of employment. Here the employees remain on the site—the towboat—for 30–day periods. In this case, it is the site which travels. Therefore, § 639.4(i)(6) is not applicable.

Furthermore, the situation here is unlike that of the bus drivers, traveling salesmen, and airplane crews mentioned in the regulation. Although each of the examples used in the regulations involves employees who travel from point to point, these employees do not spend regular, month-long periods of time traveling on one particular vehicle. In addition, the court notes that planes, buses, and railroads do not have as extensive living facilities as do the towboats in the case at bar. This provides further evidence that § 639.4(i)(6) is not applicable to this case.

Therefore, the court holds that, due to the semi-autonomous nature of the towboats, each towboat was analogous to a branch office or store. Since the towboats were not in the same geographic area, each towboat was a separate site of employment. *Cf. Moore v. On–Line Software Int'l, Inc.,* No. 92 C 1563, 1993 WL 244902, 1993 U.S.Dist. LEXIS (N.D.Ill. April 13, 1993) (branch office closely supervised by home office).

Inasmuch as the plaintiffs admit that no more than twenty persons on each towboat lost their jobs, the plaintiffs have not suffered the requisite employment loss at a

"single site of employment." 29 U.S.C.S. § 2101(a) (1990). Accordingly, since the WARN Act does not apply to the case at bar, the court need not reach the other issues discussed in the parties' motions for summary judgment.

## CONCLUSION

Therefore, the court being advised, **IT IS HEREBY ORDERED as follows:**

1. That plaintiffs' motion to certify this case as a class action (Doc. # 68) is **denied;**

2. That plaintiffs' motion for summary judgment as to liability (Doc. # 81) is **denied;**

3. That Ingram's motion for summary judgment (Doc. # 85) is **granted;**

4. That Midland's motion for summary judgment (Doc. # 87) is **granted;** and,

5. That M/G's motion for summary judgment (Doc. # 89) is **granted.**