**Ferdie P. WILTZ, suing on behalf of themselves and all persons similarly situated; Michael A. Spencer, suing on behalf of themselves and all persons similarly situated, Plaintiffs–Appellants,**

v.

**M/G TRANSPORT SERVICES, INC.; Midland Company, Inc.; Ingram Ohio Barge Company, Defendants–Appellees.**

No. 96–5744.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 8, 1997.

Decided Oct. 31, 1997.

Lawrence (briefed), Crestview Hills, KY, for Plaintiffs–Appellants.

Stephen Sloan Eberly (argued and briefed), Vorys, Sater, Seymour & Pease, Cincinnati, Ohio, for Defendant–Appellee M/G Transport Services, Inc.

Michael R. Schmidt (briefed), Robert F. Keith, Cohen, Todd, Kite & Stanford, Cincinnati, OH, for Defendant–Appellee Midland Co., Inc.

Jack F. Fuchs, Thompson, Hine & Flory, Cincinnati, OH, S. Mark Klyza (briefed), Barclay D. Beery (argued and briefed), The Kullman Firm, New Orleans, LA, Henry L. Walker, II, Brown, Todd & Heyburn, Covington, KY, for Defendant–Appellee Ingram Ohio Barge Co.

Before: KRUPANSKY and SUHRHEINRICH, Circuit Judges, ROSEN *, District Judge.

SUHRHEINRICH, Circuit Judge.

The Worker Adjustment Retraining Notification Act (WARN or the Act), 29 U.S.C. §§ 2101–2109 (West Supp.1997), which provides for sixty-days advance notice to employees and their communities of a mass layoff or plant closing, is not implicated unless fifty employees are affected at a "single site of employment." The primary question in this appeal is whether towboat-barges are separate sites such that the number of employees may not be aggregated so as to trigger WARN's notification requirements. The district court determined that each towboat was a separate site of employment, with less than fifty employees each, and granted summary judgment to defendant employers. We disagree. However, we also conclude that fifty employees did not suffer an "employment loss" within the meaning of the Act, because most were offered continued employment by the buyer after the asset sale. We therefore **AFFIRM** on this alternative ground.

Paul B. Martins (briefed), James B. Helmer, Jr. (briefed), Frederick M. Morgan, Jr. (argued and briefed), Helmer, Lugbill, Martins & Neff, Cincinnati, OH, Meredith Lynn gan, sitting by designation.

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michi-

## I.

Until December 28, 1994, M/G Transport Services, Inc., based in Paducah, Kentucky, owned 314 barges and eight towboats. M/G's towboats transported barges throughout the Ohio, Mississippi, and Tennessee River systems. M/G's towboats could be found at any given time from Pittsburgh to New Orleans, nearly a 2,000 mile span of river. Each vessel was crewed by two crews of ten employees each. Each crew generally alternated thirty-day stints. A crew consisted of one captain, one pilot, one chief engineer, one mate, one cook, an assistant engineer, and four deckhands. The captain was the ranking supervisor of the vessel. The captain, pilot, mate and chief engineer gave work instructions to the crew members that reported to them.

Each towboat had complete living quarters. Food, fuel, and supplies for the towboats were ordered and purchased by the Paducah, Kentucky office and were delivered to the towboats at various locations. Routine maintenance and repairs were performed on board the towboat, but major repairs were handled by the Paducah office.

On December 28, 1994, M/G sold its assets to defendant Ingram Ohio Barge Co. In the final purchase agreement both M/G and Ingram declined any responsibility "for any liability, obligation ... of any kind or character related to ... the WARN Act...." The agreement provided further that "[p]rior to the Closing Date, Seller, upon its own initiatives, shall terminate or permanently layoff all of the employees associated with the Purchased Assets, which termination or layoff shall be effective upon or prior to Closing." The sale became effective at 1:00 p.m. on December 28, 1994. Sometime that afternoon, M/G placed termination notices in the mail.

Although it felt that it "ha[d] no legal obligation to give written notice," on December 14, 1994, M/G sent a letter to its employees at their home addresses notifying them of a possible sale with Ingram, and that if the sale went through, their "last day of actual work for M/G will be on the date of the sale." The letter also contained the following notice concerning possible employment with Ingram:

Ingram has agreed to accept applications from our employees and we continue to be hopeful that a large percentage of M/G employees will be employed by Ingram. For those of you currently on the boats, Ingram personnel will be coming on the boats to give you applications. For those of you not currently on the boats, Ingram will be taking applications at the Executive Inn in Paducah on December 19 and 20, 1994, from the hours of 8:00 a.m. to 6:00 p.m. each day.

Between December 12 and 20, Ingram personnel boarded five of the eight motor vessels to be purchased from M/G in order to distribute applications, collect completed ones, and answer any question that M/G employees might have regarding possible employment with Ingram. On December 19 and 20, representatives of Ingram distributed applications and conducted interviews at the executive Inn in Paducah. By the end of the day on December 20, Ingram had received 106 applications from M/G employees.

Of the 160 M/G workers affected, 106 applied for jobs with Ingram. Ingram made offers to eighty-two of those workers. Forty-nine employees accepted offers from Ingram, thirty declined, and three failed Ingram's drug test. Of the forty-nine who accepted and were hired, eight started working on December 28, 1994. Only twenty-eight were hired within thirty days of December 28, 1994. Twenty-four of the 106 applicants either were not given offers by Ingram, could not be contacted, or were not put to work by Ingram after hiring for other reasons.[1]

Plaintiffs, former M/G employees Ferdie Wiltz and Michael Spencer, on behalf of themselves and those similarly situated, sued M/G, M/G's parent company, The Midland Company, and the entity to which it sold its towboat business, Ingram Ohio Barge Co.,

---

1. M/G's facts differ somewhat, but as we shall later see, the discrepancies do not affect the analysis.

arguing that defendants violated WARN by failing to provide advance notice to plaintiffs of the sale. On cross-motions for summary judgment, the district court entered judgment for all defendants. The district court stated the issue as follows: "[A]re a number of almost self-sufficient towboats ranging up and down thousands of miles of rivers a "single site of employment" under the WARN Act [?]" *Wiltz v. M/G Transport Servs., Inc.*, 925 F.Supp. 500, 502 (E.D.Ky. 1996). The district court ruled that "due to the semi-autonomous nature of the towboats, each towboat was analogous to a branch office or store ... [and][s]ince the towboats were not in the same geographic area, each towboat was a separate site of employment." *Id.* at 504. Plaintiffs appeal.

## II.

### A.

As noted, WARN requires employers to provide sixty-days advance notice to employees and communities concerning plant closings [2] or mass layoffs.[3] 29 U.S.C. § 2102(a). The Act is designed to provide workers, their families, and communities with some warning about the sudden loss of employment. 20 C.F.R. § 639.1 (1997)(Department of Labor regulation defining purpose of WARN); *Teamsters Local Union 413 v. Driver's, Inc.*, 101 F.3d 1107, 1108, 1109 (6th Cir.1996). An employer who violates WARN is liable for back pay, lost benefits, civil penalties, and attorney fees. 29 U.S.C. § 2104(a)(1). The Act is not triggered, however, unless fifty or more employees are affected at a "single site of employment." 29 U.S.C. § 2101(a)(2).

■ The statute does not define "single site of employment," but Department of Labor regulations have filled in the gap. *See* 20 C.F.R. § 639.3(i)(1–8)(1997)(defining "single site of employment").[4] *See generally* 29 U.S.C. § 2107 (authorizing Secretary of Labor to prescribe regulations "as they may be necessary to carry out this chapter"). "Although no bright line test exists, the plain language of the statute and regulations makes clear that geographic proximity provides the touchstone in determining what constitutes a 'single site.'" *Driver's, Inc.*, 101 F.3d at 1109.[5] Thus, "[c]ontiguous facili-

**2.** A "plant closing" is a shutdown of a single site of employment that causes an "employment loss" for fifty or more employees during a thirty-day period. 29 U.S.C. § 2101(a)(2)(West Supp. 1997).

**3.** A "mass layoff" is any other "employment loss" within any thirty-day period for either (a) fifty to 499 full-time employees, if the number laid off equals thirty-three percent of the work force; or (b) 500 full-time employees. 29 U.S.C. § 2101(a)(3)(West Supp.1997).

**4.** 20 C.F.R. § 639.3(i)(1997) provides in relevant part:

(i) *Single site of employment.* (1) a single site of employment can refer to either a single location or a group of contiguous locations. Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, may be considered a single site of employment.
(2) There may be several single sites of employment within a single building, such as an office building, if separate employers conduct activities within such a building. For example, an office building housing 50 different businesses will contain 50 single sites of employment. The offices of each employer will be its single site of employment.
(3) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.
(4) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.
(5) Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate workforces are considered separate single sites of employment.

**5.** In *Teamsters Local Union 413 v. Driver's, Inc.*, 101 F.3d 1107 (6th Cir.1996), we observed:

The legislative history to the Act also supports the interpretation of "single site" made by the district court. The Conference Report states that the Conference Agreement removed all references to "place of employment" and replaced them with "single site of employment." The Report states that "[t]his change

ties or those in close geographic proximity are generally single sites of employment and geographically separate facilities are generally separate sites." *Id.* (citing 20 C.F.R. § 639.3(i)(1–6)).

■ Notwithstanding, the regulations also provide for mobile workers. Subpart (6) of 20 C.F.R § 639.3(i) "addresses employees who travel from place to place in the course of performing their job." *Driver's, Inc.*, 101 F.3d at 1110. *See also* 54 Fed.Reg. 16,042, 16,051 (1989)(stating that subpart (6) deals with "traveling workers who report to but do not work out of a particular office"). "While such workers may well be considered as a separate operating unit, their status must be determined in terms of the single site of employment to which they are assigned." *Driver's Inc.*, 101 F.3d at 1110 (quoting Department of Labor's comments).

Subpart (6) provides:

(6) For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

20 C.F.R. § 639.3(i)(6)(1996). The subpart is written in the disjunctive; a "single site" may be either the place to which employees are assigned as their home base, the place from which their work is assigned, or the place where they report for work. *Id.; Driver's, Inc.*, 101 F.3d at 1110.

■ Plaintiffs argue, as they did before the district court, that subpart (6) defines their situation precisely: "Plaintiffs worked *on* boats; they did not work *for* boats. Those boats are based in Paducah, Kentucky and 'travel from point to point' along the inland waterways." In rejecting this argument, the district court reasoned:

The subsection cited by plaintiffs refers to employees who are "outplaced" or travel from their site of employment. Here the employees remain on the site—the towboat—for 30-day periods. In this case, it is the site which travels. Therefore § 639.4(i)(6) is not applicable.

Furthermore, the situation here is unlike that of the bus drivers, traveling salesmen, and airplane crews mentioned in the regulation. Although each of the examples used in the regulations involves employees who travel from point to point, these employees do not spend regular, month-long periods of time traveling on one particular vehicle. In addition, the court notes that planes, buses, and railroads do not have as extensive living facilities as do the towboats in the case at bar. This provides further evidence that § 639.4(i)(6) is not applicable to this case.

*Wiltz*, 925 F.Supp. at 504. The district court's determination is a legal conclusion we review de novo. *Driver's, Inc.*, 101 F.3d at 1109.

■ We side with plaintiffs. In the first place, towboats are like planes, buses, and railroads; and all are no more than tools of "workers whose primary duties require travel from point to point." Plaintiffs, like railroad workers, bus drivers, and salesmen, use these moving vehicles to carry out the business of the employer—here, moving cargo for customers. Indeed, mobility is the *raison d'etre* of a towboat.[6] Thus, subpart (6) is

---

is intended to clarify that geographically separate operations are not to be combined when determining whether the employment threshold for triggering the notice requirement is met." H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 1046 (1988), *reprinted in* 1988 U.S.C.A.N.N. 2078, 2079.

In addition, the Department of Labor has stated that "[t]he common thread in determining what is a single site would appear to be a sufficient degree of geographic continuity as

well as an operational connection." 9A Ind. Empl. Rights Man. (BNA) 595:954 (1988). *Id.* at 1109–1110.

**6.** Defendants contend under this line of reasoning, commonly-owned, floating restaurant/night clubs located in Pittsburgh, Cincinnati, Louisville, St. Louis, Memphis, and New Orleans would be separate WARN Act sites, while a series of floating restaurant/night clubs on the Ohio and Mississippi Rivers in the same cities would be a single WARN Act site, because they can be moved. This analogy is flawed. The "primary

clearly applicable. The district court found it was not controlling because the towboats here were essentially floating "branch offices." But given the obvious comparison to a train, plane or car, it is difficult to simultaneously conceive of a towboat as a "site" (unless one subscribes to the wave/particle theory of quantum mechanics).[7] The district court's characterization of towboats as floating "sites" or branch offices cannot be reconciled with the common sense meaning of "site" or subpart (6).[8]

The district court's emphasis on the travel period and living accommodations does not alter this conclusion. Neither the length of the stay nor the luxury of the accommodations has any relevance under the regulations. That "outstationed" employees are also counted reinforces this conclusion, since "outstationed" employees will obviously live, for some period, at the place where they are stationed, just as towboat employees may live on a towboat for up to thirty days at a time. Thus, the lower court's attempt to distinguish bus drivers, traveling salesmen, and airplane crew on this basis was simply not persuasive in light of the statute, as interpreted by the regulation.

Rather, the regulation focuses on the place to which employees are assigned as their home base, from which their work is assigned, or to which they will report. Each of these factors point in only one direction: Paducah, Kentucky. There is uncontroverted proof in the record that all crew assign-

ments to towboats were made by M/G Transport's Paducah office, and that 80% of the crews physically reported to Paducah for assignment to the towboats. In fact, in a confidential communication to Ingram on November 24, 1994, counsel for M/G represented that "[o]ne port, Paducah, Kentucky, is used in our employee system." Counsel for M/G also attested in an affidavit filed with the court that "M/G Transport has its offices and operational headquarters in Paducah, Kentucky...."

Furthermore, it is undisputed that fuel and lubrication oil for the towboats were ordered and purchased by the Paducah office and delivered to the various towboats at various locations set by the Paducah office. The chief engineer and assistant engineer reported to the M/G Transport port engineer in Paducah. All captains, pilots, mates, cooks, and deckhands reported to the M/G Transport port captain in the Paducah office. In sum, absent the fiction that the towboats here were "floating sites," the only conclusion to be drawn on this record is that Paducah was the "single site of employment" for plaintiffs.

*Driver's, Inc.* is distinguishable.[9] There we determined that eleven different truck terminals operated by a single employer in six states did not constitute a "single site" under subpart (6). Critical to that decision was the fact that each trucker started and ended his day from the same terminal, one

duty" of a floating restaurant/night club is not "travel from point to point." In any event, we need not decide that issue today.

7. *See* K. Scott Hamilton, *Prolegomenon to Myth and Fiction in Legal Reasoning, Common Law Adjudication and Critical Legal Studies*, 35 Wayne L.Rev. 1449, 1455 (1989)(describing wave/particle paradigm of light).

8. The district court stated that "[t]he regulations are only valid if limited to ambiguities arising from sites in the same geographic area which might evade the purpose of the WARN Act by dividing up operations." *Wiltz*, 925 F.Supp. at 504. This holding ignores Congress's grant of interpretative rulemaking authority at 29 U.S.C. § 2107(a)("The Secretary of Labor shall prescribe such regulations as may be necessary to carry out this Act."). The Act does not define "single site of employment." Under these cir-

cumstances, deference to the Labor Department's regulations is appropriate. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). *See generally Driver's, Inc.*, 101 F.3d at 1109 (noting that there is no statutory definition of "single site" of employment in the Act, but that the Department of Labor "has promulgated regulations that provide guidance in interpreting the statute"); *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir.1996)(noting that there is no statutory definition of "single site" of employment but that Department of Labor regulations and comments "provide significant guidance in interpreting these provisions"); *Carpenters Dist. Council v. Dillard Dep't Stores*, 15 F.3d 1275, 1289 (5th Cir.1994)(same).

9. *Driver's, Inc.* was decided after the parties filed their briefs.

near his or her residence, and that the terminals were hundreds of miles apart. We held that "[t]his terminal [was] the trucker's 'home base.'" *Driver's, Inc.*, 101 F.3d at 1110. Because the true focus was the terminal, and not the trucks themselves, the analysis of subpart (6), while applicable, was not dispositive. *Id.* (noting also that "subpart (6) cannot be read in a vacuum ... [t]he other subparts of the regulation provide guidance in determining what is a 'single site' and, as discussed above, geographic considerations weigh heavy in the analysis"). Thus, *Driver's, Inc.*'s presumption that absence of community impact cuts against a finding of "single site" is not fatal to plaintiffs' claim in this case.[10] *See id.* at 1109 (noting that statute and regulations "plainly focus on whether the resulting job loss will be concentrated in one geographic area").

Plaintiffs argue in the alternative that subpart (8), which addresses "truly unusual organizational situations," should apply. 29 C.F.R. § 639.3(i)(8). Given our holding that subpart (6) is controlling, we need not address this argument.

### III.

■ Defendants argue that summary judgment in their favor is nevertheless appropriate for another reason: fewer than fifty employees actually suffered a WARN Act "loss of employment." *See* 29 U.S.C. §§ 2101(a)(2)(defining "plant closing" as the "permanent or temporary shutdown of a single site of employment, ... if the shutdown results in an employment loss at the single site of employment during any 30–day period for 50 or more employees ... "); 2101(a)(3)(defining "mass layoff" as "a reduction in force which ... results in an employment loss at the single site of employment during any 30–day period for ... at least 33 percent of the employees ... and ... at least 50 employees ... "). This issue was raised

but not ruled upon below. We may, of course, affirm on an alternative grounds. *Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir. 1985).

"Employment loss" is defined in the Act as:

(A) An employment termination other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6–month period.

29 U.S.C. § 2101(a)(6). The DOL has explained that the term "termination" is "to have [its] common sense meaning" as the "permanent cessation of the employment relationship...." 54 Fed.Reg. 16,047 (1989).

Defendants maintain that the Act's fifty-employee threshold has not been met because all but twenty-four employees suffered at most a "technical termination" as a result of the sale to Ingram. Defendants calculate it this way: Ingram offered the 160 M/G employees the opportunity to apply for work with Ingram before the date of the sale. Only 106 submitted applications, and forty-nine of these were put to work within six months of December 28, 1994. The fifty-four who did not apply must be considered a voluntary departures. So too of the thirty who applied but declined Ingram's offer. The three who failed the drug test suffered termination for cause and therefore cannot be counted in the fifty. This leaves twenty-four who did not receive an offer or were not contacted, far below the threshold figure of fifty.[11]

Plaintiffs respond that under the clear terms of § 2101(a)(6), a court need only look at the number of employees terminated on the date of the closing or the mass layoff to determine whether a WARN violation has occurred to determine "employment loss." The Tenth Circuit dispensed with this argu-

---

**10.** As a practical matter, there is probably little geographic impact under the scenarios described in subpart (6). Notwithstanding, the Department of Labor felt that mobile workers needed some protection, and we must accommodate that concern in our interpretation of the Act and regulations.

**11.** M/G's figures vary slightly. M/G states that only 104 employees applied with Ingram, and that four failed the drug test. Thus, according to M/G's calculations, only twenty-one employees suffered a true "employment loss." Any difference in figures is immaterial, however, since under either of defendants' arguments the fifty employee threshold is not met.

ment in *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272 (10th Cir.1994), noting that it need not get into the definitional debate over the word "terminate," because Congress had foreclosed this argument in the context of a sale by adopting a "sales exclusion" to WARN. *Id.* at 1280.[12] It provides that:

> (1) In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice of any plant closing or mass layoff in accordance with section 2102 of this title, up to and including the effective date of the sale. After the effective date of the sale, part or all of an employer's business, the purchaser shall be responsible for providing notice of any plant closing or mass layoff in accordance with section 2102 of this title. *Notwithstanding any other provision of this chapter, any person who is an employee of the seller (other than a part-time employee) as of the effective date of the sale shall be considered an employee of the purchaser immediately after the effective date of the sale.*

29 U.S.C. § 2101(b)(1)(emphasis added). The accompanying regulation explains:

> This provision preserves the notice rights of the employees of a business that has been sold, but creates no other employment rights. *Although a technical termination of the seller's employees may be deemed to have occurred when a sale becomes effective, WARN notice is only required where the employees, in fact, experience a covered employment loss.*

20 C.F.R. § 639.6 (1996)(emphasis added).

■ Thus, in § 2101(b) "Congress explicitly stated that employees who find themselves transferred from one company to another because of a sale simply are not to be held by any court to have suffered a remediable 'employment loss.'" *Headrick*, 24 F.3d at 1280. *See also International Alliance of Theatrical & Stage Employees v. Compact Video Servs., Inc.*, 50 F.3d 1464, 1467 (9th Cir.)(adopting Tenth Circuit's view), *cert. denied,* —— U.S. ——, 116 S.Ct. 514, 133 L.Ed.2d 423 (1995). That is, the statute makes clear that a sale is not a WARN event: "the obligation to warn employees in the event of a closure or mass layoff skips from seller to buyer, never triggered by the sale. Any argument to the contrary is simply foreclosed by the statute itself." *Headrick*, 24 F.3d at 1280. The proper focus in this case, then, is what actually happened to M/G's employees after the sale (notwithstanding the provision in the final purchase agreement that seller had responsibility for terminating employees or the fact that the termination notices apparently went out after the sale had been completed).

Courts addressing § 2101(a)(6), whether in the context of a sale, plant closing, or mass layoff, have all applied a "'practical, effects-driven analysis of whether a break in employment actually occurred' to trigger the notification requirements of the WARN Act." *Gonzalez v. AMR Servs. Corp.*, 68 F.3d 1529, 1531 (2d Cir.1995)(per curiam)(quoting with approval opinion of district court, 877 F.Supp. 108, 113 (E.D.N.Y.1995)). In other words, where the termination is at best technical, they have found no WARN violation.[13] *See Rifkin v. McDonnell Douglas Corp.*, 78

---

**12.** Retired Associate Justice White, sitting by designation, remarked:

> Now, perhaps the sales exclusion was an unnecessary safeguard—perhaps the transfer of employees during a sale would not have qualified as a "termination" under the Act as originally introduced—but we have no need to pursue that question. Congress added clear marching orders specifically so that we might never have to face that question, directing firmly that no sale shall implicate the Act.

*Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1281 (10th Cir.1994).

**13.** This view also finds support in the legislative history:

> MR. CHAFEE. In the Senate bill approved last summer, notice was not required where an employer was selling a business and the buyer *offered* to hire "substantially all" of the employees, or where an employer was relocating a facility "within a reasonable commuting distance" and offered to transfer "substantially all" of the employees. At that time, I expressed concern about the vagueness of the term "substantially all" as it applies in these two instances. Has anything been done in the new version to address this problem?
> MR. METZENBAUM. The language to which the Senator refers was revised by the conferees. The term "substantially all" has been removed entirely from the statutory language. Instead, the sale or relocation of a business is now treated in the definition section of the bill. *When an employee is offered continued employment by the buyer of a facility, or a transfer to*

F.3d 1277, 1282–83 (8th Cir.1996)(mass lay-off; finding no termination where laid off employees were rehired, actuality of termination controlled and not expectation of employees); *Gonzalez*, 68 F.3d at 1530–31 (mass layoff; where eighteen of sixty-five "surplussed" employees were placed in other positions with no break in service no "employment loss" occurred, using practical, effects-driven analysis); *International Alliance*, 50 F.3d at 1465–68 (sale of business; where buyer made offers to 309 of 314 employees of buyer despite termination letter from seller and requirement that employees apply for employment with buyer, sales exclusion applied and WARN was not implicated); *Headrick*, 24 F.3d at 1280–81 (transfer of management responsibilities; rejecting employees' argument that they were terminated because they were immediately rehired by buyer and never faced need to find new job; termination was technical since employees were rehired just a "millisecond" after termination); *Moore v. Warehouse Club, Inc.*, 992 F.2d 27, 30 (3d Cir.1993)(plant closing; explaining that issue is not "timing of transfer offer" but "whether the employees experienced an employment loss," holding that no employment loss occurred where transfer offers were extended on date of closing rather than prior to it); *Alter v. SCM Office Supplies, Inc.*, 906 F.Supp. 1243 (N.D.Ind. 1995)(sale; where, within one week of the sale, the buyer had made offers to, and received acceptances from 217(77%) of seller's employees, no employment loss occurred); *Martin*, 877 F.Supp. 108 (holding that no termination occurred where employees declared surplus due to elimination of department were immediately placed in other positions).

Applying the same analysis here, it is clear that fifty employees did not suffer an "employment loss" under WARN. Because all but twenty-four of the 160 employees continued, or had the opportunity to continue, employment with Ingram, the threshold figure was not met. *Cf. Rifkin*, 78 F.3d at 1283 (employees who chose early retirement

in lieu of layoff did not suffer "employment loss" under § 2101(a)(6)(A)); *Alter*, 906 F.Supp. at 1250 (holding that as for fifteen employees that were not hired by buyer, record showed that thirteen did not apply for employment, making their employment loss voluntary, likewise with employee who one refused to take drug test, and four employees who failed pre-employment drug tests were discharged for cause). We think the Eighth Circuit summed it up well:

> An employee cannot be defined as "terminated" if he or she is, in fact, rehired in the same position.
>
> . . . .
>
> . . . [T]his conclusion is consonant with the purpose of the WARN Act, that is, "to ensure adequate employment opportunities (by way of notice of imminent employment loss) for retraining and/or reemployment." *Moore v. Warehouse Club, Inc.*, 992 F.2d 27, 30 (3d Cir.1993). It is designed to give "workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(1995); *Martin v. AMR Services Corp.*, 877 F.Supp. 108, 113 (E.D.N.Y.1995), *aff'd, Gonzalez v. AMR Services*, 68 F.3d 1529 (2d Cir.1995). Employees in the situation at hand who were in fact rehired do not fall within the purpose of the WARN Act because there is no need for retraining or alternative jobs.

*Rifkin*, 78 F.3d at 1282.

Although we **REVERSE** the district court's ruling that towboats are "single sites of employment," we nonetheless **AFFIRM** because fifty employees did not suffer an "employment loss" as that term is used in the Act.

---

*another facility within a reasonable commuting distance, that employee has not suffered "an employment loss" that would help trigger the advance notice requirement.*

100 Cong. Rec. S8377 June 22, 1988 (emphasis added).