BECKER,* Chief Circuit Judge,
concurring and dissenting.
I join in Part V of the majority opinion which provides guidance to the district court on the question of damages. I also subscribe to the majority’s conclusion that the determination of plaintiffs' “single site of employment” is governed by 20 C.F.R. § 639.3(i)(6). Nonetheless, I am constrained to dissent from Parts III and IV of the majority opinion since I believe that, under the legal precepts announced therein, the Chester center was clearly the plaintiffs’ single site of employment, and that there is no genuine issue of material fact on that question. I would therefore affirm the district court’s order granting the plaintiffs’ motion for summary judgment on liability.
I.
It will be useful to commence the discussion of the liability issue by rescribing the guidance that the majority imparts to the district court at the close of its liability discussion.
Given the unorthodox employment arrangements at issue in this case, concluso-ry statements that the plaintiffs were or were not assigned work “from” Chester, and that they did or did not report “to” Chester, will generally prove inadequate. The problem with such statements is that in our era of modern telecommunications, it is often necessary to distinguish the ultimate origin and destination of information from mere conduits through which the information is passed.
* * # * * #
*153 To avoid this problem in the future, we emphasize that we interpret 20 C.F.R. § 639.3(i)(6) to focus not on the formalities of where certain machines were located, but rather on where the people were who were ultimately responsible for creating and receiving the information. On remand, the district court should focus its inquiry accordingly.
Maj. Op. at 149-50 (emphasis added). I agree with the majority that in applying 20 C.F.R. § 639.3(i)(6) to this ease, a court must be careful to distinguish “mere conduits” from those people “ultimately responsible for creating and receiving the information” from the sales representatives. I dissent essentially because I believe that the majority has failed to faithfully apply its own precepts.
If the majority had done so, it would have been compelled by the evidence to conclude, as the district court already has, that:
The record in this case establishes, without any genuine dispute, that all instructions, assignments, rules, and orders to the plaintiff salesmen emanated from the Chester Virginia administrative headquarters. [It is not] significant that, to some extent, specific assignments and instructions were issued by way of the district managers, or that plaintiffs’ reports to the administrative headquarters were funneled through their district managers.
Ciarlante v. Brown & Williamson Tobacco Corp., No. CIV.A.95-4646, 1996 WL 656448, *2 (E.D.Pa. Nov. 6, 1996) (emphasis added). The highlighted portion of the district court opinion reflects the uncontroverted evidence that both the sales representatives and the sales managers reported back to the Chester center from which they received their assignments and from which all of their day to day needs were handled. In other words, the evidence shows that the sales managers acted as conduits between the Chester center and the sales representatives. It is only by ignoring this evidence, and hence its own admonition to look to who was “ultimately responsible for creating and receiving the information”, that the majority can conclude that a genuine issue of material fact is raised by evidence that the sales representatives received instructions from and reported to both the Chester center and their sales managers.
As I will show, this evidence is not in conflict, but instead commands the conclusion that the Chester center was the ultimate site from which the plaintiffs’ work was assigned and to which they reported. Since I believe that the evidence is so clear that the Chester center was the site from which plaintiffs’ work was assigned and the site to which they reported, I do not deal with whether the Chester center was also their “home base” as that phrase is used in 20 C.F.R. § 639.3(i)(6).
A.
I turn first to whether the Chester center was the site from “which [the sales representatives’] work [was] assigned.” 20 C.F.R. § 639.3(i)(6). The majority acknowledges that there is abundant evidence that Chester was the source of plaintiffs’ day to day assignments. See Maj. Op. at 147-48. However, the majority finds a genuine issue of material fact on the basis of two pieces of evidence that “conflict” with this view. The first is the statement of Randy Groonwald, a former sales manager in Wisconsin, that the sales representatives in his district “were assigned work ... by me ... [and] were not assigned work by anyone in Chester, Virginia.” App. 1018. The second is the following snippet from the deposition of Thomas A. Marshall, a named plaintiff, and former sales representative:
Q. Did you ever take any orders from anyone at the administrative center down in Chester, Virginia?
A. No, I didn’t.
App. 2270.
As I will show, however, Groonwald’s statement conflicts with the view that Chester was the ultimate source of the sales representatives’ assignments only if one ignores, as the majority apparently has, the uncontroverted evidence that the Chester center was the source of assignments for both the district sales managers and the sales representatives. Marshall’s testimony, when placed in context, not only does not create a genuine issue of material fact, but strongly *154 counsels in favor of summary judgment for the plaintiffs.
1.
Marc Lowery and Dwight Hughes, former employees at the Chester center, described the process by which assignments were distributed to American Tobacco field sales personnel. Lowery declared that:
[My job was] to coordinate and issue, out of the Chester office, all releases, bulletins and instructions to the field sales organization, including the field sales representatives and the district sales managers. These included the day-to-day instructions, assignments and procedures to be followed by the field sales representatives and district sales managers.
* ' sis sis # *
It was through these letters and instructions coming from the Chester office that field salespersons were told what specific products management wanted them to sell arid promote and how they were to do it through specific promotional strategies that they must use. These instructions in the form of “Sales Coverage” letters were regularly issued from the Chester office every five (5) to eight (8) weeks.
App. 2209-10. (emphasis added).
Similarly, Hughes stated that:
Sales representatives and district sales managers received their instructions and assignments in the form of written memos or letters that we called ‘field sales information,’ ‘sales campaign,’ or ‘sales coverage’ letters. These instructions and assignments were generally issued in mass mailings [from the Chester Office].
[These letters] told the sales representatives and district sales managers what to sell and how to sell it.
App. 2186. (emphasis added).
As the foregoing makes clear, Groonwald’s statement that the sales representatives in his district “were assigned work ... by me ... [and] were not assigned work by anyone in Chester, Virginia” is easily reconciled with the evidence that the Chester center was the ultimate ’source of all of plaintiffs’ assignments. The fact is that no where in Groonwald’s affidavit does he contradict the evidence that, like all sales mangers, he received the day to day assignments that he gave to his sales representatives from the Chester office. Thus, at most, Groonwald’s affidavit indicates that he served as a conduit between Chester and his sales representatives. As the majority noted, mere conduits must be disregarded in the effort to determine the ultimate source of plaintiffs’ day to day assignments.
2.
The majority also relies on the following portion of Thomas Marshall’s deposition:
Q. Did you ever take any orders from anyone at the administrative center down in Chester, Virginia?
A. No, I didn’t.
This excerpt, when returned to its proper context, provides no support for remand.
First, a review of the testimony preceding the excerpt makes clear that when Marshall stated that he did not receive instructions from anyone at Chester, he simply meant that he did not receive instructions from any particular person at Chester:
Q. You didn’t answer my question. Who in Chester, Virginia did you report to?
A. Well to the company itself.
Q. So there is no person that you reported to there?
A. There is no person.
Q. So you did not have a boss in Chester, Virginia; is that right?
A. Well, there’s lots of bosses in Chester, Virginia.
Q. Was there a particular person, a boss that told you what to do in Chester, Virginia, that you—
A. No.
Q. —can identify today?
A. No.
App. 2260.
More fundamentally, the overall content of Marshall’s testimony unequivocally supports the view that the sales representatives re *155 ceived their assignments from the Chester center. Nowhere is the imprudence of the majority’s reliance on Marshall’s testimony to preclude summary judgment more in evidence then in the following exchange:
Q. You make a distinction between supervising and reporting; is that right?
A. Yes, I think I do.
Q. Now, explain that to me, in your own words.'
A. Well, I believe that there were supervisors, supervising the sales reps in the field. But I think that the sales reps, we were instructed by the [Chester] office, and the office seemed to have full control of us. Anything we did out there seemed to relate to the office. I could not get hold of Mr. Ogorek [his sales manager] if I wanted to, except on voice mail.
Tom Ogorek didn’t tell me what to do out there in the field. I was sent a campaign letter from Chester, Virginia stating what I was to do, and how long I was to do it, how much I was to spend, and the brands I was to work. They made the changes in the field. If there was an executive order out there changing our field operation, it came from voice mail.
App. 2260. (emphasis added)
In short, none of the evidence relied on by the majority conflicts with the view that the ultimate source of the sales representatives’ assignments was the Chester center.
B.
While a determination that the plaintiffs’ work was assigned from the Chester center is, by itself, a sufficient basis on which to affirm the district court, see Maj. Op. at 145, I also believe that the majority errs in concluding that there is a genuine issue of material fact as to whether the Chester center was the site to “which [the sales representatives] report[ed].” 20 C.F.R. § 639.3(i)(6). The majority reaches this conclusion by finding a conflict between, for example, the statement of Mark Lowery, who worked at the Chester center from 1986 to 1995, that “[t]he Chester office is where all reported information flowed and ... where it all ended up” and the statement of Randy Groonwald that the sales representatives in his district “hand-delivered or mailed to me daily call summaries detailing their activities [every] week,” and that they “did not report to anyone in Chester, Virginia.” However, it is only by ignoring the import of evidence critical to its inquiry — evidence that the sales representatives reported to Chester through the sales managers — that the majority is able to find a conflict between these statements.
The role of the sales managers in the American Tobacco “reporting process”, is best summarized by Joseph Pierce, the former head of Sales Audit and Analysis for American Tobacco:
I understand that in earlier years the original expense report forms were mailed directly to the Chester office from the homes of each field sales representative, which resulted in our receiving a thousand or so separate envelopes from all over the country. Eventually, we used the district sales managers to collect the original report forms from the field sales representatives in their group, and the district sales managers would send the originals to the Chester office, which resulted in our receiving only about 150 or so envelopes (the number of district sales managers) from fewer locations.
In this regard the district sales manager assisted the Chester office, to the extent they eyeballed the forms, unstapled papers, matched the receipts to the proper form, and otherwise organized the paperwork in a form that made it easier for our staff in the Chester office to review and analyze each of the approximately 1,000 field sales representative’s expense reports and paperwork. Even after we started ' using the district sales managers to funnel the paperwork from the field to the Chester Office, it was still the Chester Office which reviewed and analyzed the field sales representatives’ expense reports and approved for processing (or disapproved) the reports.
App. 2202-03. (emphasis added).
Pierce’s statement is confirmed by other evidence that makes clear that all of the *156 plaintiffs’ reports (be they sales or expense reports) ultimately flowed to the Chester center, and that,’ to the extent that the district sales managers helped funnel the information from the field, they were assisting and facilitating the work of the Chester center. Based on this understanding of the American Tobacco “reporting process”, I believe that there is no genuine issue of fact that the sales managers were merely conduits through which the plaintiffs reported to the Chester center, and thus that the Chester center was the site to which the plaintiffs’ reported. I would affirm the district court on this basis as well.[1]
C.
Out of an abundance of caution, I address the' contention, raised by the defendants, that the Chester center itself was just a conduit since the assignments that it sent to the field personnel and the reports that it received were passed through it to the executive offices of American Tobacco located in Stamford, Connecticut. The majority does not. focus on this possible view of the evidence and instead frames the choice of plaintiffs’ single site of employment as being between the Chester center and the geographical districts in which the plaintiffs’ worked. However, I address this argument, because the defendants may attempt to revive it on remand.
While there has been insufficient factual development for us to determine "whether in fact the Stamford office was the location “of the people who were ultimately responsible for creating and receiving the information” from the plaintiffs, I do not believe that such development is necessary to the disposition of this case. Even if the defendants were to succeed in showing that the Stamford office, rather than the Chester center, was the plaintiffs’ single site of employment, the defendants would still be liable under the WARN Act, as a matter of law, since the “mass layoff’ would still have resulted “in an employment loss at the single site of employment ... for ... at least 50 employees.” See 29 U.S.C. § 2101(a)(3)(B).
D.
Before concluding, I must consider the broader, policy-based aspect of the issue. This is the first time that a court has been asked to apply 20 C.F.R. § 639.3(i)(6) to determine the single site of employment for a geographically dispersed workforce that does not physically report to any site of employment at any time. Cf. Wiltz v. M/G Transport Services, Inc., 128 F.3d 957 (6th Cir.1997) (issue was whether separate towboats on which plaintiffs’ lived during 30 day assignments or defendant’s main office to which over 80% of the crews physically reported for assignments to towboats was single site of .employment pursuant to 20 C.F.R. § ,639.3(i)(6)); Teamsters Local Union J¡.13 v. Driver’s, Inc., 101 F.3d 1107 (6th Cir.1996) (issue was whether eleven separate trucking terminals to which plaintiffs’ physically reported could be combined to constitute one single' site of employment under the Act).
■ The majority observes that the employment arrangement at issue is “unorthodox.” See Maj. Op. at 149. I take this to mean that it believes that this case represents something of an outlier. I disagree. Rather, I suspect that such situations represent the new frontier in WARN Act litigation. In the next decade, technology will permit workers of all types, not just salespeople or other mobile workers, to escape the physical confines of traditional offices. I acknowledge that the majority has recognized the possibility that such plaintiffs may prevail within the framework of 20 C.F.R. § 639.3(i)(6), hence the remand here for further proceedings. However the tenor of the majority opinion, and its refusal to affirm the grant of sum *157 mary judgment for plaintiffs on what I believe to be an unequivocal record, sends the opposite (and wrong) message and, I think, establishes bad precedent.

 Honorable Edward R. Becker, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on February 1, 1998.

. I am not sure what to make of the majority's statement at the outset of this section that its "inquiry focuses on the location of the personnel who were primarily responsible for reviewing [the plaintiffs’ reports].’’ Maj. Op at 148 (emphasis added). While I believe that the personnel at the Chester center were both primarily and ultimately responsible for reviewing the reports, I am uncertain as to how much of the majority’s analysis turns on a distinction between these two terms — or even whether the shifting terminology is intentional. At all events, I believe that this inconsistency should not affect the majority’s instruction to the district court to focus its inquiry on remand on those "ultimately responsible for creating and receiving the information.”