**TEAMSTERS LOCAL UNION 413,
et al., Plaintiffs–Appellants,**

v.

**DRIVER'S, INC., Defendant–Appellee.**

No. 95–4275.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 23, 1996.

Decided Dec. 3, 1996.

Robert K. Handelman (argued and briefed), Handelman & Kilroy, Columbus, OH, for Plaintiffs-Appellants.

James P. Friedt (argued and briefed), Vorys, Sater, Seymour & Pease, Columbus, OH, for Defendant-Appellee.

Before MERRITT, NELSON and DAUGHTREY, Circuit Judges.

MERRITT, Circuit Judge.

The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101–2109, provides for sixty-day advance notice to employees and their communities concerning plant closings or mass layoffs. In order to trigger the Act, fifty employees must be affected at a "single site." The district court granted summary judgment to defendant, holding that the layoff in this case did not trigger the protections of the Act. The sole issue on appeal is whether eleven different facilities in six states operated by defendant constitute a "single site" for purposes of triggering the notification requirements of the Act. None of the separate facilities had as many as fifty employees, but, taken all together, they exceeded fifty employees. Because we find that the various facilities are not a "single site" as defined by the regulations interpreting the Act, we affirm the judgment of the district court.

## I.

The facts are not in dispute. Plaintiffs are three local unions representing truckers employed by defendant Driver's Inc. Driver's, a broker, provides truck drivers to its customers to drive the customer's trucks. Driver's largest customer was PPG Industries. PPG is not a party to this case because Driver's is the actual employer of the truck drivers affected. Driver's had a contract with PPG to supply PPG with drivers to operate the PPG-owned truck fleet. To service this account, Driver's maintained base terminals at eleven different locations around the country: Illinois, North Carolina, Pennsylvania, Ohio, Texas and Wisconsin. Driver's also had a facility in Delaware, Ohio, also the location of the PPG Transportation Center. On November 11, 1993, PPG notified Driver's that it was terminating the contract effective December 18, 1993 due to economic problems. Driver's then notified in writing the affected employees about the layoff. The layoff affected 85 employees at eleven different sites. The maximum number of employees affected by the layoff at any one of the eleven facilities was 18.

The affected employees were truck drivers assigned to work out of one of eleven different terminals. They were permanent residents of the various communities surrounding the eleven different terminals. They would start and end their work week from this terminal. The trucks that the employees drove were owned by PPG and were stored at these various terminals. During the week the truckers could be dispatched anywhere nationwide. The drivers at the eleven terminals received their route assignments from dispatchers located at the PPG Transportation Center in Delaware, Ohio, who were employed by PPG. There was no exchange of truckers between the different terminals. If a truck was permanently moved to a new location, the affected driver would be offered a chance to move to the new location.

Repair and maintenance problems with the trucks were reported to the supervisor located at the terminal to which the trucker was assigned. "Supervisors" were primarily mechanics and exercised no supervisory authority over the truckers. If there was no supervisor at a terminal or a repair was needed while the trucker was on the road, the problem was reported to the PPG Transportation Center. All repairs over $25 were to be approved by the PPG maintenance manager located in Delaware, Ohio. Accidents were reported to Driver's safety director in Delaware, Ohio.

Management decisions concerning safety, payroll, discipline and other personnel ac-

tions were made by Driver's personnel in Delaware, Ohio. The truckers were paid from a central location in Indianapolis, Indiana.

The truckers at each of the eleven locations elected representatives· from that location to act as spokesperson for issues concerning the truckers. Defendant Driver's could communicate with either the terminal representative or an individual trucker. The truckers are also members of different unions. The safety forms required by the Occupational Safety and Health Administration were maintained by each individual terminal. State law controlled the workers' compensation and unemployment benefits for each terminal.

## II.

The question presented on appeal is whether multiple facilities operated by the same employer constitute a "single site" under the Act. The determination is a legal conclusion reviewed *de novo* by this Court.

■ There is no statutory definition of "single site" of employment in the Act, but the Department of Labor has promulgated regulations that provide guidance in interpreting the statute. Although no bright line test exists, the plain language of the statute and regulations makes clear that geographic proximity provides the touchstone in determining what constitutes a "single site." Con-

tiguous facilities or those in close geographic proximity are generally single sites of employment and geographically separate facilities are generally separate sites. 20 C.F.R. § 639.3(i)(1–6).[1] The statute and regulations plainly focus on whether the resulting job loss will be concentrated in one geographic area. *Cf. Wiltz v. M/G Transp. Servs., Inc.,* 925 F.Supp. 500, 503 (E.D.Ky.1996) (layoff of towboat crewmen who lived in various locations and worked on boats ranging over thousands of miles of waterway but reported to ·a central office did not work at one single site for purposes of the Act). One of the purposes of the Act is to provide local communities, as well as workers, some warning when a group of workers suddenly becomes unemployed in a short period of time. Where the workers are geographically separated, as here, the impact on the community is reduced.

·The legislative history to the Act also supports the interpretation of "single site" made by the district court. The Conference Report states that the Conference Agreement removed all references to "place of employment" and replaced them with "single site of employment." The Report states that "[t]his change is intended to clarify that geographically separate operations are not to be combined when determining, whether the employment threshold for triggering the notice

1. (1) A single site of employment can refer to either a single location or a group of contiguous locations. Groups of structures which form a campus or industrial park, ór separate facilities across the street from one another, may be considered a single site of employment.

(2) There may be several single sites of employment within a single building, such as an office building, if separate employers conduct activities within such a building. For example, an office building housing 50 different businesses will contain 50 single sites of employment. The offices of each employer will be its single site of employment.

(3) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.

(4) Noncontiguous sites in the same geographic area which do not share the same ˙staff· or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of a town and which are managed by a single emplóyer are separate sites if they employ different workers.

(5) Contiguous buildings owned by the same employer which ·have separate management, produce different products, and ·have separate workforces are considered separate single sites of employment.

(6) For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they ·are covered for [the Act's] purposes.

20 C.F.R. § 639.3(i).

requirement is met." H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 1046 (1988), reprinted in 1988 U.S.C.A.N.N.2078, 2079.

In addition, the Department of Labor has stated that "[t]he common thread in determining what is a single site would appear to be a sufficient degree of geographic continuity as well as an operational connection." 9A Ind. Empl. Rights Man. (BNA) 595:954 (1988).

The legislative history and the language of the regulations emphasize that geographical considerations are the strongest factors in determining whether separate facilities owned or operated by the same employer are considered single or separate sites under the Act. At least one court has stated that the proximity determination creates a presumption of whether a site is a single site. *Frymire v. Ampex Corp.*, 61 F.3d 757, 766 (10th Cir.1995), *cert. dismissed*, —— U.S. ——, 116 S.Ct. 1588, 134 L.Ed.2d 685 (1996). Once the contiguous/noncontiguous geographic determination is made, the operational, managerial and labor variables can defeat or reinforce the presumptions established by the proximity and contiguity factors. *Id.* Noncontiguous facilities may be single sites only if there is some connection between the sites beyond common ownership, such as a regular practice of sharing of equipment or employees. 20 C.F.R. § 639.3(a) (regulations state that "[a]n employer may have one or more sites of employment under common ownership or control"). Sharing of staff and equipment and sharing the same "operational purpose" are appropriate criteria for determining whether non-contiguous sites comprise a "single site" for purposes of the Act. *See, e.g., Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280–81 (8th Cir.1996); *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 934 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 582, 130 L.Ed.2d 497 (1994).

Plaintiffs contend that subpart (6) of 20 C.F.R. § 639.3(i) is dispositive of the situation presented here. This subpart addresses employees who travel from place to place in the course of performing their job. (*See* n.1, *supra.*) Examples are railroad and airline workers and travelling salespersons. Subpart (6) states "the single site of employment to which they are *assigned as their home base,* from which their work is assigned, *or* to which they report will be the single site in which they are covered...." (Emphasis added.) This subpart is written in the disjunctive: any one of the alternatives may qualify as the definition of "single site." In promulgating subpart (6), the Department of Labor indicated it was concerned about "travelling workers who report to but do not work out of a particular office." 54 Fed.Reg. 16,042, 16,051 (1989). "While such workers may well be considered as a separate operating unit, their status must be determined in terms of the single site of employment *to which they are assigned.*" *Id.*

It is clear from the undisputed facts here that the affected employees were each *assigned* to one of eleven different facilities as their home base, thereby qualifying each of the eleven facilities as single sites under the plain language of subpart (6). Subpart (6), therefore, while applicable to the truckers here, is not dispositive. Furthermore, subpart (6) cannot be read in a vacuum. The other subparts of the regulation provide guidance in determining what is a "single site" and, as discussed above, geographic considerations weigh heavy in the analysis.

We agree with the district court that the eleven terminals do not constitute a "single site" for purposes of the Act. Several factors influence that decision. First, and most importantly, as discussed above, the terminals are not contiguous. To the contrary, they are hundreds of miles apart spread over six states. Each trucker starts and ends his or her workweek from the same terminal—one that is near his or her residence. This terminal is the trucker's "home base." Second, the truckers were assigned to a certain location, and the terminals did not share equipment or the services of truckers. Third, the truckers at each terminal were represented by different unions, and each terminal had its own seniority system. Fourth, each terminal was considered separate by one agency of the federal government, as demonstrated by the separate safety logs required by the Occupational Safety and Health Administration.

The plaintiffs' reliance on the fact that PPG in Delaware, Ohio, had some operation-

al control is not dispositive. 20 C.F.R. § 639.3(a) (regulations state that "[a]n employer may have one or more sites of employment under common ownership or control."); *see Moore v. On–Line Software Int'l, Inc.,* 1993 WL 244902 (N.D.Ill. Apr. 13, 1993), *adopted in pertinent part,* 1993 WL 189753 (N.D.Ill. June 3, 1993) (branch offices of single employer in different locations not "single site" despite significant control over operations by main office). The centralized payroll and certain other centralized managerial or personnel functions are not enough to deem the location a "single site." *See International Union, United Mine Workers v. Jim Walter Resources, Inc.,* 6 F.3d 722, 724–26 (11th Cir.1993). The district court held, and we agree, that the fact that the truckers had to report to both PPG and Driver's personnel in Delaware, Ohio, for matters such as maintenance, repairs, accidents and payroll was relevant but not "dispositive" of the single site determination. Opinion and Order (Aug. 24, 1995) at 13. The control exercised over each terminal by PPG and Driver's personnel in Delaware, Ohio, is insufficient to persuade us that the terminals are a "single site."

In sum, although many corporate management functions started in Delaware, Ohio, either through Driver's or PPG Transportation, the day-to-day operations were run out of each terminal. This situation is not unlike many others where companies maintain headquarters in one location but have many "branch offices" in other locations. The case law and the regulations make clear that in this type of operation—centralized management overseeing quasi-independent individual facilities in geographic areas distant from the main office—each individual facility is a "single site" under the Act and the individual facilities are not to be aggregated as a "single site."

For the foregoing reasons, we affirm the judgment of the district court.