**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MIKE BADER; TIMOTHY BEARD; PAT
BIGGINS; JIM BLAKE; ALISE
BRADLEY; MARK CHAMBERLAIN;
ARTHUR L. CLARK; KATHY
CLEMENTS; JERRY CULLINS; JAMES J.
DOLAN; ROBERT EMMETT DOLAN;
CAL DOLMAN; KELLY L. DUBBS;
JAMES DUMOND; STEPHEN DURFEE;
ANDREW ESPINOZA; JAY GARRICK;
RAY GREEN; FRANK GRUBB; CHRIS
HAYES; BRAD HENDERSON; WILLIAM
LEE HOLLINGSWORTH; ALLAN
HUSSER; BRUCE HUTSON; CHRIS
JIMISON; JIMMIE JIMISON; DAVID
JUNGERT; JENNIFER KELLER; HAROLD
KLUNDT; STEVEN KOYLE, BELINDA
LIVINGSTON; RAY MAIN; DARNELL
MARCH; DAVID MILLER; VIRGINIA
MORAN; FARON MORGAN; RICK
PEDERSON; ANTHONY PIERCE;
SHAWN POLSTON; AARON RAMAGE;
JOHN RAMAGE; THERESA REECE-
SIVERTSON; WILLIS RHEA; GENE
ROSS; WILLIAM SCHRIVER; TERRY
SHIPLEY; JOE SMITH; BUDD
STAEHNKE; JOHN STEPHENS; ARNOLD
STRAND; TIM TRENT; DARRELL
WALDO; MICHAEL WAUDBY;

No. 05-36012

D.C. No.
CV 03-0085 RFC

OPINION

12091

DEAN WATSON; BERNARD WEHRI;
SAMUEL WEYERS; SAM YETLEY;
JIMMY ZIMMERMAN, and all persons
similarly situated; ROBERT SMITH,
JR.; TRACY KELLER; MICHAEL A.
MORGAN; CRAIG RANG; PAUL
MCFARLAND; SHAWN LEBAUGH,
            *Plaintiffs-Appellants,*

                v.

NORTHERN LINE LAYERS, INC., a
Delaware corporation; QUANTA
SERVICES, INC., a Delaware
corporation,
            *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Montana
Richard F. Cebull, District Judge, Presiding

Argued and Submitted
August 10, 2007—Seattle, Washington

Filed September 10, 2007

Before: Cynthia Holcomb Hall, A. Wallace Tashima, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Tashima

## **COUNSEL**

Kenneth D. Peterson, Peterson & Scholfield PLLC, Billings, Montana, for the plaintiffs-appellants.

Mark J. Levine, Levine & Associates, P.C., Houston, Texas, for the defendants-appellees.

**OPINION**

TASHIMA, Circuit Judge:

Plaintiffs, former employees of Northern Line Layers, Inc. ("NLL"), sought compensation from NLL and its parent, Quanta Services, Inc. (collectively "Defendants"), for violating the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109 ("WARN Act" or "Act"), which requires employers to give employees 60 days' notice in the event of a plant closing or mass layoff at a "single site of employment." This case presents the question of whether construction workers' "site of employment" is the company headquarters or the workers' actual work site, under the Act's implementing regulations. We conclude that it is the latter. Consequently, Plaintiffs have not demonstrated that 50 or more laid-off employees worked at a single site of employment. We therefore hold that the layoffs at NLL are not covered by the WARN Act; consequently, we affirm the district court's grant of summary judgment in favor of Defendants.

**FACTUAL AND PROCEDURAL BACKGROUND**

NLL was a wholly-owned subsidiary of Quanta Services, Inc. ("Quanta") that provided specialty construction services, primarily for telecommunications companies. NLL's central administrative office and maintenance shop were located in Billings, Montana, in adjacent buildings. In December 2002, NLL also employed construction workers and project managers at construction sites in Arizona, California, Colorado, Montana, Nevada, North Carolina, Texas, Utah, Vermont, and Wyoming.

Payroll records show that in August 2002, NLL had 33 employees working in Billings. Three additional employees were associated with the General Administration department, but did not work in Billings. The remaining 162 employees worked at construction sites located in seven states, each with

between one and 35 employees. Payroll records from December 21, 2002, show that there were then 28 Billings-based employees, two administrative employees based outside of Billings, and 82 employees based at project sites in 10 states, with between one and 28 employees at each site.

All financial accounting was done at the NLL headquarters in Billings. This included payment of the vendors and subcontractors that supplied materials and services at remote construction projects. Employee time sheets were prepared by remote project managers and submitted to company headquarters in Billings. NLL's accounting department then collected the data and submitted them to an outside payroll services company, which generated the checks and sent them back to Billings. Payroll checks were then sent from Billings to remote job sites for distribution by local project managers.

Ray Green, the former comptroller of NLL, stated that NLL set up field offices to manage the day-to-day operations at the individual project sites. These field offices had the authority to hire and fire employees as individual project needs dictated. Green further noted that some employees hired at project sites never came to Montana and that the employees working at remote sites were residents of many different states or had no permanent residence at all, moving from job site to job site. The former president of NLL stated that when an individual construction project concluded, the on-site project manager often laid off non-management crew members who had worked on that project, without any direction from the Billings home office.

In support of their motion for summary judgment, Defendants submitted responses to interrogatories from 23 plaintiffs who worked at remote construction project locations. These plaintiffs were asked, "What is the name of your supervisor at your last job alignment [sic] with NLL?" Two plaintiffs listed a Billings-based supervisor, and both of these plaintiffs were project managers on their respective construction sites.

Two plaintiffs listed both a Billings-based supervisor and an on-site project manager. The remaining 19 plaintiffs listed a local project manager as their supervisor. Plaintiffs provided no evidence regarding the location of supervisors for the other laid-off employees who had not joined the lawsuit.

A Quanta senior vice president stated that in 2002, the telecommunications market experienced an economic downturn, which decreased the demand for NLL's construction services. He further noted that NLL suffered significant financial losses, and on January 1, 2003, Quanta merged the assets of NLL into Par Electric ("Par"), another wholly-owned subsidiary of Quanta. Seventy NLL employees were transferred to Par's payroll in early January 2003; however, by the end of March 2003, 58 of them had been laid off. NLL gave no notice to the Montana State Dislocated Worker Unit, nor any formal 60-day advance notice before laying off any NLL employees.

Sixty-four former NLL employees brought the present action, alleging that NLL violated the WARN Act, and some of the Plaintiffs also asserted pendant state law wrongful discharge claims. The parties filed cross-motions for summary judgment on the WARN Act claims. The district court granted NLL's motion for summary judgment, finding that NLL's Billings office was not a "single site of employment" for 50 or more laid-off employees, as required to trigger the WARN Act and the implementing Department of Labor ("DOL") regulations. The district court then dismissed the pendant state law claims without prejudice to their being brought in state court.

## STANDARD OF REVIEW

We review cross-motions for summary judgment de novo. *See Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, there are no

genuine issues of material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We review de novo whether the district court correctly applied the relevant substantive law. *See Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). Whether multiple work locations are a "single site of employment" is a mixed question of law and fact, which we also review de novo. *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 934 (5th Cir. 1994).

## ANALYSIS

**[1]** The WARN Act requires employers to provide 60 days' notice to employees and to the state dislocated worker agency in the event of a plant closing or a mass layoff. *See* 29 U.S.C. § 2102(a). The purpose of the Act is to give advance notice to workers and the community so that workers can prepare to seek alternative employment and communities can prepare for the economic disruption of a mass layoff. 20 C.F.R. § 639.1(a); *see also* H.R. Conf. Rep. No. 100-576 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2078, 2079. An employer who fails to comply with the provisions of the Act is liable to each affected former employee for back pay and benefits for up to 60 days, as well as attorney's fees. 29 U.S.C. § 2104(a).

The WARN Act defines a "plant closing" as the loss of employment for at least 50 full-time employees at a single site of employment during any 30-day period, as a result of the permanent or temporary shutdown of a single site of employment. *Id.* § 2101(a)(2). A "mass layoff" is a similar reduction in force that does not result from a plant closing but includes the loss of at least 50 full-time employees at a single site and at least 33 percent of the total workforce at that site. *Id.* § 2101(a)(3). Plaintiffs submitted payroll records showing that NLL or Par, its successor, employed 197 people on

August 24, 2002, 109 people on December 21, 2002, 70 people on January 1, 2003, and 12 people on April 1, 2003.[1]

**[2]** The DOL has promulgated a definition of "single site of employment" under the WARN Act, and it is this regulation which guides our principal inquiry:

> (i) *Single site of employment.* (1) A single site of employment can refer to either a single location or a group of contiguous locations. Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, may be considered a single site of employment.
>
> (2) There may be several single sites of employment within a single building, such as an office building, if separate employers conduct activities within such a building. For example, an office building housing 50 different businesses will contain 50 single sites of employment. The offices of each employer will be its single site of employment.
>
> (3) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.

---

[1]Defendants, for their part, submitted evidence that there was no 30-day period in which there was a layoff of more than 50 employees. The district court did not resolve this disputed issue of fact, resting the grant of summary judgment on its finding that fewer than 50 were laid off at any affected site of employment. We assume, for purposes of this appeal, that Plaintiffs can establish that at least 50 persons were laid off over a 30-day period between August 2002 and March 2003.

(4) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.

(5) Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate workforces are considered separate single sites of employment.

(6) For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

20 C.F.R. § 639.3(i);[2] *see generally* 29 U.S.C. § 2107(a) (authorizing the DOL to prescribe regulations carrying out the Act).

---

[2]20 C.F.R. § 639.3(i) contains two other subsections not at issue in this case:

(7)   Foreign sites of employment are not covered under WARN. U.S. workers at such sites are counted to determine whether an employer is covered as an employer under § 639.3(a);

(8)   The term "single site of employment" may also apply to truly unusual organizational situations where the above criteria do not reasonably apply. The application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable.

### 1. Geographic Definitions of a "Single Site"

Subsections (1)-(5) clearly do not assist Plaintiffs' claim. Because the Billings office and maintenance shop are contiguous buildings, they likely qualify as a single site of employment under 20 C.F.R. § 639.3(i)(1).[3] The total number of employees at both sites, however, was never more than 33, an insufficient number to trigger the WARN Act. Furthermore, no single construction project site had more than 35 employees at any one time.

The remote construction project sites cannot be aggregated under 20 C.F.R. § 639.3(i)(3) or (4) because those sites are located in many different states and are not "in reasonable geographic proximity" or "in the same geographic area." *Cf. Teamsters Local Union 413 v. Driver's, Inc.*, 101 F.3d 1107, 1109 (6th Cir. 1996) (noting that "[a]lthough no bright line test exists, the plain language of the statute and regulations makes clear that geographic proximity provides the touchstone in determining what constitutes a 'single site' "); *Frymire v. Ampex Corp.*, 61 F.3d 757, 766 (10th Cir. 1995) (interpreting 20 C.F.R. § 639.3(i) as creating a presumption against single site status for work locations that are not geographically proximate to each other).

Plaintiffs presented no facts suggesting that any of the NLL construction site locations was geographically proximate to another such site. Payroll records show that none of the construction projects was in Billings. Further, none of the projects was in the same locality as any other project; all but two represented the only NLL project located in a given state, and the two projects in California were hundreds of miles apart.

---

[3]The administrative office and maintenance shop might be deemed separate sites based on 20 C.F.R. § 639.3(i)(5) if they have separate management, separate workforces, or produce separate products; however, because the total number of employees at both the office and shop is less than 50, we need not resolve this question.

*See Williams*, 23 F.3d at 934 (holding that employment locations in different states separated by hundreds of miles could not be aggregated as a "single site" under the WARN Act due to lack of proximity).

[3] Because none of the construction project locations was geographically proximate to Billings or to any other construction project location, Billings and the various project sites are separate sites of employment under 20 C.F.R. § 639.3(i)(1)-(5). NLL therefore had 50 employees at a "single site" only if the number of remote construction workers can be aggregated with the number of headquarter employees. To consider this possibility, we look to § 639.3(i)(6)'s provision for "outstationed workers."

## 2. Outstationed Workers' "Single Site"

Section 639.3(i)(6) counts certain categories of mobile employees as part of a site of employment distinct from that at which they are physically located, that site being the site of their home base for WARN Act purposes. Plaintiffs contend that all NLL employees who work outside of Billings are "outstationed," that Billings is their home base, and that the Billings headquarters is therefore the "single site of employment for all NLL employees under § 639.3(i)(6).

We disagree with Plaintiffs' interpretation of the regulation. We note at the outset that Plaintiffs may not have been "outstationed" at all. The term most logically connotes a situation where employees live for a short period of time at a certain site, departing for home when the work is done. *Accord Wiltz v. M/G Transp. Servs., Inc.*, 128 F.3d 957, 962 (6th Cir. 1997). The remote construction workers, by contrast, were generally not residents of Montana and did not, therefore, consider Billings to be their home. The DOL's comments explain that its regulation was intended to apply to "mobile workers," including "outstationed workers and traveling workers who report to but do not work out of a particular

office." *Worker Adjustment and Retraining Notification*, 54 Fed. Reg. 16,042, 16051 (Apr. 20, 1989). The DOL also noted that in the construction industry, many workers at dispersed projects would be stationed at sites for temporary projects only and therefore would not trigger WARN Act coverage. *Id.* at 16,055.

We recognize, however, that some courts look directly to the regulation's three definitions of the "single site of employment" in order to decide whether a group of employees qualifies. *See, e.g.*, *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145 (3d Cir. 1998); *Driver's, Inc.*, 101 F.3d at 1110. Examining these definitions, we conclude that Plaintiffs have not demonstrated that Billings meets any of the criteria for assignment as NLL remote workers' site of employment. Specifically, Plaintiffs have not demonstrated that Billings was: (1) the site to which workers were assigned as their home base; (2) the site from which work was assigned; or (3) the site to which the workers reported. *See* 20 C.F.R. § 639.3(i)(6); *cf. Driver's, Inc.*, 101 F.3d at 1110 ("This subpart is written in the disjunctive: any one of the alternatives may qualify as the definition of 'single site.' ").

## A.  Home Base

We agree with Defendants that Billings was not the "home base" of NLL's construction-site employees. Although § 636(i)(6) does not define the term, we are persuaded by the reasoning of *Ciarlante* and *Driver's, Inc.* that an employee's home base is the place from which he leaves at the start of the work period and/or returns to at the end of the work period, or at the very least, where he is physically present at some point during a typical work period. *See Ciarlante*, 143 F.3d at 146; *Driver's, Inc.*, 101 F.3d at 1110.

[4] In *Ciarlante*, traveling salespersons laid off by the American Tobacco Company sought WARN Act compensation as mobile employees under § 639.3(i)(6). 143 F.3d at

141-42. The plaintiffs routinely called into the company head-quarters to check phone messages and complete administrative tasks, but normally remained in their own sales districts in the course of their business. *Id.* at 146. Reversing the grant of summary judgment on another ground, the Third Circuit held that the plaintiffs could establish that the headquarters was the home base only of those employees who were physically present there "during the course of a typical business trip." *Id.* at 147; *see also Driver's, Inc.*, 101 F.3d at 1110 (holding that the home base of plaintiff truck drivers was the trucking terminal at which the drivers started and ended his or her workweek); *cf. Wiltz*, 128 F.3d at 962 (noting that 80 percent of the plaintiff towboat crew members "physically reported to Paducah," the city the court ultimately held to be the crews' single site of employment, for their assignment to the boats).

[5] Here, Plaintiffs have not presented any evidence that the NLL employees who worked at remote construction locations physically reported to Billings at all during a typical work period.[4] The former comptroller of NLL stated that many laborers working on NLL construction projects were hired and fired at the location of the project, without ever being physically present in Billings. He also stated that some NLL employees would travel from one construction project to another in locations across the country but without physically reporting to Billings. Finally, he stated that some NLL employees were never physically present in the state of Montana. Overall, the picture drawn here is of scattered "home

---

[4]In response to an interrogatory asking where they last worked, many Plaintiffs working on remote construction projects stated both their remote location but added that they always "worked out of Billings." Plaintiffs argue that this establishes Billings was the home base for such employees. These statements, however, are insufficient to raise a genuine issue of material fact on this issue. They constitute merely bare assertions of a legal conclusion, not supported by any other "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993).

bases" at the various construction sites throughout the country, and plaintiff-workers who had no need to physically report to Billings for any purpose. Plaintiffs have failed to demonstrate that Billings was the home base of a sufficient number of NLL employees.

## B.    Site From Which Work Was Assigned

**[6]** Nor have Plaintiffs shown that Billings can be considered the site from which work was assigned the remote construction workers. For the majority of plaintiffs, work originated on-site rather than in Billings. *Cf. Wiltz*, 128 F.3d at 962 (noting that towboat crews received their route assignments from the employer's home office in Paducah, Kentucky, which it found to be the crews' single site of employment). Day-to-day management of the workers similarly occurred on-site. *Cf. Ciarlante*, 143 F.3d at 148-49 (vacating grant of summary judgment because the parties submitted conflicting evidence of the location of day-to-day management of traveling salespeople); *Driver's, Inc.*, 101 F.3d at 1111 (holding that trucking terminals constituted various sites of employment because day-to-day operations were run out of these terminals, even though route assignments were made from a centralized location elsewhere). Under either test, Plaintiffs have not presented evidence that a sufficient number of employees at remote job sites were assigned work out of Billings.

Of the plaintiffs based at remote construction sites who responded to Defendants' interrogatories, 19 out of 23 reported that their supervisor was the project manager at the remote location. Only two responded that their supervisor was a Billings-based employee, and both of those plaintiffs were project managers at those construction locations. Two other employees listed both a Billings-based manager and a remote project manager as their supervisor. With respect to the construction workers, the record demonstrates that the day-to-day decisions on the construction sites were not actively managed

by the Billings headquarters, but were instead overseen by on-site project managers. Further, the project managers would often hire and fire employees on their own prerogative, independent of any supervision from the Billings headquarters. This further shows that such plaintiffs were not directly assigned any work from Billings; rather, their work assignments originated on-site with their direct supervisor. Although project managers apparently received assignments from Billings to a certain extent, Plaintiffs did not submit evidence that NLL employed a sufficient number of these managers to reach the requisite 50 full-time employees.

**[7]** The primary evidence Plaintiffs present to support their claim that the Billings office managed activities at remote construction sites is that staff at the Billings office was responsible for all accounting, billing, payroll, and administrative functions. But although this assistance facilitated NLL's ability to operate remote construction projects while maintaining a single administrative center, Plaintiffs' actual work involved construction, not accounting and administration. The coordination of payroll and personnel functions simply does not constitute an assignment of work under § 639.3(i)(6). *See Ciarlante*, 143 F.3d at 147; *Driver's, Inc.*, 101 F.3d at 1111. Therefore, we hold that Plaintiffs failed to raise a genuine issue of fact regarding whether a sufficient number of NLL employees were assigned work from Billings to qualify the employees for WARN Act protection.

## C.   Site to Which Employees Report

**[8]** Finally, under § 639.3(i)(6), the site to which outstationed employees report will be deemed their "single site of employment." Again, Plaintiffs failed to demonstrate that Billings so qualifies. The site to which an employee at a remote location reports is the site at which management issues work orders, and directly reviews a remote employee's job performance and work product in order to evaluate progress and set goals. *See Ciarlante*, 143 F.3d at 148 (the place to which trav-

eling salespeople reported was "the location of the personnel who were primarily responsible for reviewing sales reports and other information sent by the sales representatives, in order to record sales, assess employee performance, develop new sales strategies, and the like"). Again, therefore, "reporting" to Billings for the purposes of payroll and other centralized administrative functions is insufficient, standing alone, to qualify Billings as the single site of employment. *See Driver's, Inc.*, 101 F.3d at 1110-11.

Although remote project managers may have reported directly to Billings-based NLL vice-presidents, Plaintiffs have not presented any evidence that Billings-based managers evaluated the job performance and work product of management and non-management employees alike at remote job sites.[5] Instead, as discussed above, most employees at remote job sites reported directly to local supervisors, implying that employees' job performance and work product were evaluated there. *Cf. Ciarlante*, 143 F.3d at 148-49 (finding genuine issue of material fact as to where sales employees reported, where it was unclear whether weekly sales reports were reviewed locally or at a central office).

## CONCLUSION

In sum, Plaintiffs have failed to raise a genuine issue of material fact whether 50 or more people were laid off at a "single site of employment" under the WARN Act. The remote construction locations clearly do not qualify as a single site of employment under § 639.3(i)(1)-(5). With respect to subsection (6) of the regulation, there is no evidence that NLL employees at remote construction projects physically reported to Billings during the course of the projects, that Billings originated work or was responsible for the day-to-day

---

[5]Indeed, it is improbable that a manager in Billings would evaluate the work product or performance of remote construction workers because of the material nature of the work product in this case.

management of the majority of workers at the remote construction project locations, or that the workers directly reported their progress to Billings.

Accordingly, the judgment of the district court is **AFFIRMED.**