PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

RONALDA MESON,
                    *Plaintiff-Appellant,*

v.

GATX TECHNOLOGY SERVICES
CORPORATION; GATX FINANCIAL
CORPORATION,                                              No. 06-1942
                    *Defendants-Appellees,*

and

EPLUS GROUP, INCORPORATED,
                    *Party in Interest.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(8:04-cv-03806-DKC)

Argued: September 25, 2007

Decided: November 16, 2007

Before WILLIAMS, Chief Judge, DUNCAN, Circuit Judge, and
T. S. ELLIS, III, Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Duncan wrote the opinion, in
which Chief Judge Williams and Senior Judge Ellis concurred.

## COUNSEL

**ARGUED:** James Earl McCollum, Jr., College Park, Maryland, for
Appellant. Robert J. Kriss, MAYER BROWN, L.L.P., Chicago, Illi-

nois, for Appellees. **ON BRIEF:** Michael E. Geltner, GELTNER & ASSOCIATES, P.C., Washington, D.C., for Appellant. Lauren R. Noll, MAYER BROWN, L.L.P., Chicago, Illinois, for Appellees.

## OPINION

DUNCAN, Circuit Judge:

Ronalda Meson ("Meson") was employed as a regional sales manager and sales representative with GATX Technology Services Corporation ("GTS"), a corporation specializing in leasing information-technology equipment. Her employment with GTS ended in June 2004 when the corporation's assets were sold. Shortly thereafter, Meson filed a complaint against her former employer and its parent corporation, GATX Financial Corporation (collectively, "GATX"), alleging seven claims stemming from her termination. Meson subsequently consented to the dismissal of three of these claims, and GATX moved for summary judgment on the remaining four. The district court granted GATX's motion and entered final judgment in its favor on all counts. Meson appeals the court's judgment on her claims for breach of contract; violation of the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl., §§ 3-505, 3-507.1 ("Maryland Wage Law"); and violation of the federal Work Adjustment and Retraining Notification Act ("WARN Act" or "the Act"), 29 U.S.C. § 2101 *et seq.* For the reasons that follow, we affirm.

I.

Meson began working for GTS when it purchased the lease portfolio of her former employer, El Camino Resources, Ltd., in 2001. Meson was an at-will employee. She managed two employees at her small GTS office in Falls Church, Virginia, but her duties involved significant travel. In her role as regional manager, Meson reported to GTS's Tampa, Florida headquarters.

As a sales representative, Meson had the opportunity to earn commissions, in addition to receiving her base pay and management compensation. Under GTS's Sales Commission Plans ("Plans"),[1] a sales

---

[1]Three Commission Plans were issued during Meson's tenure. The parties concede that the Plans do not meaningfully differ for purposes of

representative could earn Gross Margin Commissions by arranging and completing Gross Margin Commission Events ("Commission Events") on the leases in her portfolio. Commission Events consisted of various transactions that resulted in the generation of a positive Gross Margin, or profit. Examples included lease renewal, lease extension, equipment sale, and lease termination. A portion of the expected Gross Margin Commission, labeled the Lease Origination Commission, was paid to a sales representative at the start of a lease.[2]

When a Commission Event occurred, GTS would calculate the Gross Margin generated on the lease.[3] The sales representative would then receive the Gross Margin Commission (equal to approximately twenty-five percent of GTS's profit on the transaction) less the Lease Origination Commission already paid. If the Lease Origination Commission exceeded the value of the Gross Margin Commission, the difference was deducted from the sales representative's commission account. The Plans stipulated that the sales representative had to be employed on the date commissions became payable, and "[r]esignation or termination [would] result in the forfeiture of any further commissions as of the last date of employment." J.A. 287.

In April 2004, GATX announced its plan to sell the assets of GTS to CIT Corporation ("CIT"). Employees were informed that unless offered positions with CIT, they would be paid only through July 25, 2004. Meson was not offered a position, and her employment thus ended when the asset sale closed on June 30, 2004. In response to Meson's request, GTS informed her that she would receive "no bonus payment related to [her] lease portfolio." J.A. 308.

On December 2, 2004, Meson filed a complaint against GATX in the U.S. District Court for the District of Maryland alleging: (I) breach of contract for failure to pay all compensation due; (II) viola-

---

this appeal. We therefore refer to the 2004 Plan.

[2]The Lease Origination Commission was generally equal to one percent of the original equipment cost.

[3]The Plans included a different Gross Margin calculation method for each type of Commission Event, generally trying to capture GTS's profit on the lease.

tion of the Maryland Wage Law; (III) refusal to pay severance; and (IV) violation of the WARN Act, 29 U.S.C. § 2101 *et seq.*[4] The district court applied Maryland law, the law of the forum, as neither party presented facts sufficient to justify application of any other state's law.[5] The court granted summary judgment on all Counts and entered final judgment in favor of GATX on August 1, 2006. As to Meson's breach of contract claim regarding sales commissions (Count I), the court found that Meson was not entitled to these commissions because the asset sale was not a Commission Event.[6] With respect to Count II, the court found that Meson could not invoke the Maryland Wage law because GATX did not meet the law's definition of employer. As to Count IV, the court found Meson's Falls Church, Virginia office, her fixed place of work, to be her "single site of employment." Because that office had fewer than fifty employees, the district court decided that Meson was not entitled to the protections of the WARN Act. Meson appeals the judgment on Counts I, II, and IV.

We review de novo the district court's grant of summary judgment in favor of GATX, viewing the facts in the light most favorable to Meson. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *LeBlanc v. Cahill*, 153 F.3d 134, 148 (4th Cir. 1998). Summary judgment is proper only where "there is no genuine issue as to any material fact" and GATX is "entitled to judgment as a matter of law." *See United States v. Ringley*, 985 F.2d 185, 186 (4th Cir. 1993) (citing Fed. R. Civ. P. 56(c)).

---

[4]Meson originally alleged seven counts, but later agreed to the dismissal of three.

[5]As a federal court sitting in diversity, the district court was obliged to apply Maryland law, including its choice of law provisions, unless another state's law was clearly applicable. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 623-624 (4th Cir. 1999). Neither party challenges the district court's choice of law decision on appeal; thus, we too apply Maryland law.

[6]Count I also included a claim concerning Meson's management compensation. She does not pursue this portion of Count I on appeal.

## II.

Meson's argument regarding her entitlement to Gross Margin Commissions (Count I) has mutated on appeal. In the district court, she argued that the asset sale to CIT was itself a Commission Event. Meson has since abandoned that position. Her sole argument now is that she is entitled to commissions under the performance prevention doctrine ("prevention doctrine"), a common-law principle of contract law, because the asset sale prevented her from completing Commission Events on the leases in her portfolio. Application of the prevention doctrine to the facts of this case constitutes a mixed question of law and fact, *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 724 (4th Cir. 2000), which we review by inspecting factual findings for clear error and examining de novo the legal conclusions derived from those facts, *U.S. Dep't. of Health & Human Servs. v. Smitley*, 347 F.3d 109, 116 (4th Cir. 2003).

In support of her argument, Meson relies on this court's articulation of the prevention doctrine in the seminal case of *Fuller v. Brown*: "[I]f [one party to a contract] is himself the cause of the failure of performance, either of an obligation due from him or of a condition upon which his liability depends, he cannot take advantage of the failure."[7] 15 F.2d 672, 677 (4th Cir. 1926) (quoting 2 *Williston on Contracts* ¶ 677).

The facts in *Fuller* present a paradigm of the circumstances in which the prevention doctrine has been found to apply. The employer there promised to pay an employee a share of the profits on each ship the company manufactured and sold. These "bonuses" were conditioned upon the employee rendering satisfactory service until the completion of all twelve ships contemplated by the contract. *Id.* at 675. Upon completion of each of the first six ships, the employer paid the employee fifty percent of the bonus due on the particular ship and retained the other fifty percent. The employee was to receive the remainder, as to each ship, upon completion of the twelfth ship. *Id.*

---

[7]*Fuller* applied North Carolina, not Maryland, law. At oral argument, however, the parties agreed that there is no meaningful difference between the Fourth Circuit's application of the prevention doctrine in *Fuller* and the doctrine's application in Maryland courts.

After the tenth ship was completed, the employer closed the shipyard. *Id.* at 677. The employer also refused to pay the employee the retained portions of his bonuses, which the employee then sued to recover. *Id.* Finding in favor of the employee, this court held that the completion of twelve ships merely fixed the time of payment. *Id.* at 677, 678. The court went on to note, moreover, that even if the completion of all twelve ships were considered a condition precedent to payment, "the failure to complete them cannot avail the defendant, as defendant itself was responsible for the failure." *Id.*

The few cases in which Maryland courts have found the prevention doctrine applicable involve facts similar to those in *Fuller. Singer Construction Co. v. Goldsborough*, 128 A. 754 (Md. 1925), is representative of such limited circumstances. In *Singer*, a broker was employed to sell properties for a real estate corporation. The broker "found and presented to the [corporation], within the time specified, a purchaser who was able, willing and ready to buy upon the terms specified." *Id.* at 758. The corporation, however, declined to make the sale and sold the property to another party. *Id.* The corporation also refused to pay the broker a commission, which the broker then sued to recover. The Court of Appeals of Maryland held that although the defendant had the power to decline to sell the property, "[w]here the agent has done all he undertook to do, and procured a buyer as contemplated, he may not be deprived of his right to remuneration" simply because the corporation refuses to complete the sale. *Id.*

Invoking the prevention doctrine, Meson contends that Commission Events would have occurred on her leases but for the asset sale, and since GATX was responsible for that sale, GATX must compensate her for the commissions that she would have otherwise generated. Meson's argument fails for several reasons. First, the differences between the facts in *Fuller* and *Singer* and those in this case are both significant and readily apparent. In *Fuller*, the employee was seeking the remainder of a bonus he had already earned. The ships in issue were already completed and had already generated a profit. Similarly, in *Singer*, the broker had already "furnished the act requested (i.e., the procuring of a purchaser), upon which a promise to pay commissions arose." 128 A. at 758. Here, Meson is trying to recover commissions that she did not earn, based on events which never occurred.

It is undisputed that no Commission Event, as defined by the Plan, occurred with respect to any of the leases for which Meson seeks recovery. Nor does Meson identify any specific leases that were in the midst of a Commission Event or for which she had even arranged such an event. She merely predicts that some leaseholders would have chosen to renew their leases without further action on her part. Such speculation is insufficient. To recover under the prevention doctrine, Meson must have at least arranged a Commission Event, while employed, and presented a willing and able leaseholder, with only GATX's inability or unwillingness to complete the event preventing her from consummating the transaction. *See Singer*, 128 A. at 758. As GATX correctly asserts, preventing Meson from *attempting to earn* commissions is not the same as preventing her from *receiving* commissions that she has *already earned* by completing the work necessary under the Plans.

Meson's argument also fails to recognize that the Lease Origination Commissions she received at the start of the leases fully compensated her for her completed performance. As Meson did not consummate any Commission Events, GTS could not determine whether or not these originated leases generated a profit. Thus, she was not paid any Gross Margin Commissions, but she was also not required to repay any Lease Origination Commissions.

Moreover, specific Plan provisions prevent Meson from recovering commissions on these facts. Under the Plans, to be entitled to commissions she must have been employed at the time of the Commission Events; here, she was not. Meson tries to argue that such provisions are unenforceable under Maryland law, but this argument is also unavailing. The authority on which she relies for such a proposition holds only that if a commission has already been earned, a requirement that an employee be employed on the day it becomes payable is unenforceable. *See Medex v. McCabe*, 811 A.2d 297, 303-05 (Md. 2002). Again, under this reasoning as well, Meson's failure to achieve a Commission Event prior to her termination precludes recovery.

Finally, it bears repeating that Meson was an at-will employee who could have been terminated at any time. It flies in the face of the doctrine of at-will employment to suggest that GATX was required to maintain her employment until a Commission Event occurred, or

compensate her for the lost opportunity. When GATX sold the assets of its leasing business, an action Meson admits it was permitted to take, it would certainly have had an obligation to compensate her for events already consummated. But Meson presents no basis for her argument that she was impermissibly prevented from earning speculative future commissions. As the prevention doctrine is inapplicable on these facts, we affirm the district court's grant of summary judgment in favor of GATX on Meson's breach of contract claim for failure to pay sales commissions.[8]

III.

Meson's final argument is that she is entitled to recovery under the WARN Act, 29 U.S.C. § 2101 *et seq.* Resolution of this issue requires us to determine Meson's "single site of employment" for WARN Act purposes. As none of the relevant facts are in dispute and this determination turns on statutory interpretation, we review the district court's decision de novo. *UMW v. Martinka Coal Co.*, 202 F.3d 717, 720 (4th Cir. 2000).

The WARN Act was enacted in 1988 to provide notice of sudden, significant employment loss so that workers could seek alternative employment and their communities could prepare for the economic disruption of a mass layoff. *Bader v. N. Line Layers, Inc.*, 2007 U.S. App. LEXIS 21645 (9th Cir. Sept. 10, 2007); 20 C.F.R. § 639.1(a). The Act requires certain employers to provide affected employees with sixty-days notice of a plant closing or "mass layoff." 29 U.S.C. § 2102(a). An employer who fails to provide this notice is liable to each affected employee for backpay, benefits, and attorney's fees. 29 U.S.C. § 2104(a). The statute defines "mass layoff" as a reduction in

---

[8]Meson argues in Count II that the district court erred in finding the Maryland Wage Law inapplicable to her Gross Margin Commission claim. The Maryland Wage Law mandates that an employer pay an employee all wages due for work performed prior to termination and provides for treble damages for violations. Md. Code Ann., Lab. & Empl. §§ 3-505, 3-507.1. Meson contends that the law allows her to pursue treble damages against GATX for failure to pay the commissions she sought. By Meson's own admission, since we have decided that she is not entitled to additional commissions, we need not reach this issue.

work force at a "single site of employment" that affects at least thirty-three percent of the employees and a minimum of fifty employees in a thirty-day period. 29 U.S.C. § 2101(a)(3). Thus, an employee who had a fixed workplace where fewer than fifty individuals suffered an employment loss would seem, on the face of the statute, outside of the protections of the WARN Act. Meson nevertheless claims that under Department of Labor regulations she is entitled to WARN Act coverage, because GTS's Tampa, Florida headquarters, and not her Virginia office, is her "single site of employment."

The WARN Act itself does not define "single site of employment." However, the Secretary of Labor, pursuant to her authority, has promulgated interpretive regulations. 29 U.S.C. § 2107. These regulations are entitled to "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

Meson invokes 20 C.F.R. § 639.3(i)(6) ("subpart (6)" or the "provision") of the WARN Act regulations, which states:

> For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

Meson filed an uncontested affidavit—essentially quoting the provision—stating that she "traveled a lot from point to point" and that her primary work was done outside of the Virginia office. J.A. 480. She thus claims that subpart (6) applies and, accordingly, her single site of employment is determined by the second clause of the provision. Meson further asserts that this second clause is written in the disjunctive, and because she received work assignments from, and reported to, officials at the Tampa headquarters, the Tampa office should be considered her single site of employment for WARN Act purposes. Appellant's Br. at 25-27 (citing *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145-47 (3d Cir. 1998) (apply-

ing subpart (6) in this "disjunctive" manner in a case involving salespersons who worked primarily out of their homes and cars)). GATX contends, however, that subpart (6) does not apply because Meson had a fixed place of work, and even if it does apply, the Virginia office, as Meson's "home base," is her "single site of employment" under the Act. The Department of Labor regulations do not address the apparent inconsistency that arises in the case of an employee whose duties require travel, as described in subpart (6), but who also has a fixed place of employment that appears to take her beyond the scope of the provision. Faced with this discrepancy, we conclude, consistent with the courts which have construed subpart (6) in the most closely analogous contexts, that it does not apply on these facts.

Although subpart (6) could be read literally to cover almost any employee who leaves her office, we believe it was intended to apply only to truly mobile workers without a regular, fixed place of work. A close scrutiny of the provision's language supports this conclusion. The terms "travel . . . from point to point," "outstationed," and "home base," all connote the absence of a fixed workplace. *See Ciarlante*, 143 F.3d at 146 (defining "home base" as "a site that the employee visits during the course of a typical business trip"); *Bader*, 2007 U.S. App. LEXIS 21645, at *13 ("The term [outstationed] most logically connotes a situation where employees live for a short period of time at a certain site, departing for home when the work is done."). The examples provided in subpart (6) also support this view. Bus drivers and railroad workers have no fixed workplace or office. Indeed, their jobs are characterized by travel and mobility. Although the provision includes "salespersons" as examples, the context suggests that this reference is to traveling salespersons who work primarily out of their homes or cars, rather than those who work out of fixed offices.

The commentary to the WARN Act regulations confirms our interpretation. The Department of Labor explains that subpart (6) was included in the definition of "'single site of employment' . . . [i]n order to cover [the situation of railroad industry maintenance crews who have no home base] and the situation of outstationed workers and traveling workers who report to but *do not work out of a particular office . . . .*" Commentary to Worker Adjustment and Retraining Notification Act, 54 Fed. Reg. 16042, 16051 (April 20, 1989)

(emphasis added). The commentary goes on to refer to subpart (6) as "that part of the regulation relating to *mobile workers*." *Id.* (emphasis added).

Our view of subpart (6) is consistent with the few other courts that have construed the provision in the context of an employee who has an undisputed fixed place of work. When interpreting a similar term in the Family Medical Leave Act, the Tenth Circuit concluded that subpart (6) does not govern such employees. *See Harbert v. Healthcare Servs. Group, Inc.*, 391 F.3d 1140, 1152 (10th Cir. 2004). That court reasoned (1) that all three employee examples listed in the provision do not have a fixed place of work; (2) that the agency referred to the provision as "that part of the regulation relating to mobile workers;" and (3) for employees with a fixed workplace there is no reason to believe that the Department of Labor would have chosen another single site. *Id.*; *see also Moore v. On-Line Software Int'l, Inc.*, No. 92 CD 1563, 1993 WL 244902, at *5 (N.D. Ill. Apr. 13, 1993) (finding the "only logical conclusion" to be that subpart (6) did not apply to a regional sales manager and sales representative with a "regular employment site").

When faced with more loosely analogous facts, some courts, however, have chosen to look directly to subpart (6) to determine whether an employee or group of employees qualifies for WARN Act coverage without lingering on the overarching statutory construct. These courts ascertain (1) whether the alleged "single site of employment" was the employee's home base; (2) whether the employee's work was assigned from that location; or (3) whether the employee reported to that site. If the site advanced by the employee satisfies any of the three inquiries and the other WARN Act criteria are met, that employee is entitled to the WARN Act's protections. *See, e.g.*, *Bader*, 2007 U.S. App. LEXIS 21645, at *12-13 (taking this approach despite opining that subpart (6) may not actually apply to small groups of construction workers and project managers working at sites across the country); *Ciarlante*, 143 F.3d at 145-46 (applying the provision in this manner in a case involving traveling salespersons); *Teamsters Local Union 413 v. Driver's, Inc.*, 101 F.3d 1107, 1109-11 (6th Cir. 1996) (using this approach in a case involving truck drivers).

Notwithstanding this alternative approach, we find that the purposes of the WARN Act, the provisions's language, and the Depart-

ment of Labor commentary make it plain that subpart (6) was not intended to cover employees like Meson. Meson was not a "mobile worker": she "work[ed] out of a particular office" in Falls Church, Virginia and also managed the two other employees in that office. Though she traveled to visit clients in her region and reported to officials located at the Tampa office, her position was similar to that of most other branch managers who receive work assignments from, and report to, their company's headquarters. Were we to construe subpart (6) to apply on these facts, every such regional manager or chief executive could claim the corporate headquarters—in lieu of the office she manages—as her "single site of employment." *See Moore*, No. 92 C 1563, 1993 WL 244902, at *5 (N.D. Ill. Apr. 13, 1993). We do not believe that Congress or the Department of Labor intended the provision to possess such a potentially limitless scope.

Finally, we note that the minimal impact on the Falls Church community also militates against a finding that the WARN Act's purposes would be served by applying it to Meson. *See Wiltz v. M/G Transport Servs., Inc.*, 128 F.3d 957, 963 (6th Cir. 1997) (stating that the "absence of community impact cuts against a finding of 'single site'"). As we have discussed, the WARN Act was enacted, in part, to prepare communities for the economic disruption of a mass layoff. *See* 20 C.F.R. § 639.1(a). There was no such layoff here. In fact, Meson's job loss was the only one suffered by this Virginia community as a result of the asset sale. Congress's decision to target only those employment losses affecting a minimum of fifty employees in one locale supports our conclusion that subpart (6) does not apply on these facts. We therefore find that Meson's "single site of employment" under the WARN Act was the GTS office in Falls Church, Virginia. As this office, comprised as it was of only three individuals, did not have the requisite number of affected employees to trigger application of the WARN Act, we affirm the district court's grant of summary judgment in favor of GATX on this issue.

IV.

For the reasons stated herein, the judgment of the district court is

*AFFIRMED*.