**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL
DIVERSITY; et al.,

Plaintiffs - Appellants,

v.

UNITED STATES FOREST SERVICE
and U.S. FISH AND WILDLIFE
SERVICE,

Defendants - Appellees.

No. 09-17521

D.C. No. 3:09-cv-08116-FJM

MEMORANDUM[*]

Appeal from the United States District Court
for the District of Arizona
Frederick J. Martone, District Judge, Presiding

Argued and Submitted December 7, 2010
San Francisco, California

Before: D.W. NELSON, THOMPSON, and McKEOWN, Circuit Judges.

The Center for Biological Diversity ("the Center") appeals the district

court's decision granting the U.S. Forest Service ("Forest Service") and the U.S.

Fish and Wildlife Service's ("FWS") cross-motion for summary judgment. The

---

[*]     This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3.

district court found that FWS' "letter of concurrence" regarding the impacts of the Warm Fire Recovery Project on the Mexican spotted owl ("MSO") and its critical habitat did not violate the Endangered Species Act ("ESA"). The district court also found that the Forest Service did not violate the National Forest Management Act ("NFMA") or the National Environmental Policy Act ("NEPA") in determining that the Warm Fire Recovery Project is not likely to affect the population trend of the sensitive Allen's lappet-browed bat. This Court has jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court's order granting defendants' cross-motion for summary judgment.

This Court reviews the district court's grant of summary judgment de novo. *Bader v. N. Line Layers, Inc.*, 503 F.3d 813, 816 (9th Cir. 2007). Judicial review of agency action is governed by the Administrative Procedure Act ("APA"), and we must set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Northwest Coalition for Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1047 (9th Cir. 2008) (quoting 5 U.S.C. § 706(2)(A)). The arbitrary and capricious standard is deferential, and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.* 419 U.S. 281, 286 (1974)).

## I. ESA Claim

Section 7 of the ESA requires federal agencies to ensure, through consultation with expert wildlife agencies, that their actions are "not likely to jeopardize the continued existence of any endangered species . . . or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). If the action agency determines that a proposed project is "not likely to affect" any listed species or critical habitat, and the expert agency issues a written concurrence, so-called "informal" consultation can be terminated. As long as an agency follows proper procedures, it is fully entitled to change its mind during the consultation process, and "federal courts ordinarily are empowered to review only an agency's *final* action." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007) (emphasis in original).

In this case, a thorough review of the administrative record reveals that FWS satisfied the requirements of ESA. The path to FWS' final decision can be discerned from the beginning of the consultation process to its letter of concurrence. In the scoping comments that FWS issued on February 7, 2007, it wrote that "[b]ased upon the description of the project area, the threatened

Mexican spotted owl . . . *may* occur in the area." As the consultation continued, however, the Forest Service presented evidence that allowed FWS to "conclude that there is not a resident population" of MSO in the project area. In other words, FWS "'considered the relevant factors and articulated a rational connection between the facts found and the choices made,'" *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (quoting *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005)). The same is true of FWS' consideration of the MSO's critical habitat.

FWS' concurrence also relied, in part, on the fact that the Forest Service had incorporated design features that "include[d] active management to enhance recovery of MSO habitat." Between the time of the scoping comments and the letter, the Forest Service had incorporated many of FWS' suggestions, including design features to protect soils, an increase in the number of large snags that would be retained, and revisions to its final Biological Assessment to address the effects on primary constituent elements. FWS' letter reflects a holistic assessment of all the recommendations it had made and the extent to which they had been incorporated into the Forest Service's Biological Assessment.

For all of these reasons, FWS' decision to concur in the Warm Fire Recovery Project complied with the requirements of ESA.

## II. NFMA and NEPA Claims

The NFMA requires that site-specific projects be consistent with the applicable forest plan. 16 U.S.C. § 1604(i). Under the Kaibab Forest Plan, this requires the Forest Service to "document the effect of the selected action on the viability of the population of . . . sensitive species," including the Allen's lappet-browed bat. A "viable population" is defined, in turn, "as one that has the estimated numbers and distribution of reproductive individuals to insure [sic] its continued existence and is well distributed in the planning area."

As the district court emphasized, the Ninth Circuit has held that the Forest Service may rely solely on habitat information in analyzing whether a project maintains species viability. *Lands Council v. McNair*, 537 F.3d 981, 996 (9th Cir. 2008), *overruled on other grounds by Am. Trucking Ass'ns Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Forest Service must also "describe the quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring this habitat." *Id*. at 998 (citations omitted). This approach provides that a showing of sustained habitat operates as a "proxy for the viability of that species." *Id*. This Court "will defer to [the] decision to use habitat as a proxy unless the Forest

Service makes a 'clear error of judgment' that renders its decision arbitrary and capricious." *Id*. at 998 (citations omitted).

The Forest Service's decision to use habitat as a proxy for species viability was consistent with NFMA. First of all, the Forest Service pointed out that "[p]onderosa pine has the type of bark most suitable to provide roosting habitat" for bats, and "[f]ield reviews in the summer of 2007 noted that many of the ponderosa pine still had bark attached." Though "[l]ittle is known about microsite conditions related to site selection by roosting bats," "[a]ssuming loose bark is the only criteria, the [project] area could support an increase in bat numbers due to the large numbers of standing dead trees." When it comes to numbers, the Forest Service noted the fact that "at least five to seven snags per acre will be retained on mixed conifer sites, with three to five large snags per acre retained elsewhere." Either figure exceeds (1) the Forest Plan's requirements, calling for the retention of "at least 2 snags per acre" of ponderosa pine, (2) the mean levels that the Rabe study found adequate for bats (2.6-4.3 snags/acre; 6.5-10.6 snags/hectare), and (3) historical levels in Geographical Area 13. The Forest Service's methods for making these determinations are clear from the record, and its actions comply with the requirements of NFMA.

Finally, "NEPA exists to ensure a process, not to mandate particular results." *Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1063 (9th Cir. 2002). "It requires agencies . . . to prepare an Environmental Impact Statement ("EIS") whenever they propose to undertake any major Federal action [] significantly affecting the quality of the human environment." *Id*. (internal quotations omitted). The goal of NEPA is two-fold: "(1) to ensure that the agency will have detailed information on significant environmental impacts when it makes decisions; and (2) to guarantee that this information will be available to a larger audience." *Id*. (citations omitted). Here, the Forest Service produced a lengthy EIS in which it provided the public with the detailed data and analysis underlying its determination regarding the Allen's lappet-browed bat. This EIS satisfies the Forest Service's obligations under NEPA.

**AFFIRMED**.